THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY MASSIE, Defendant-Appellant.

Second District   No. 84—0139

Opinion filed October 23, 1985.

Charles M. Schiedel and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Marshall Stevens, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, Anthony Massie, was charged by information with four counts of murder (Ill. Rev. Sat. 1983, ch. 38, pars. 9—1(a)(1), (2)), one count of felony murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(3)), and one count of attempted armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 8—4(a)). Following a jury trial, defendant was found guilty of murder and attempted armed robbery, and was sentenced to concurrent terms of 40 years' imprisonment for murder and 15 years' imprisonment for attempted armed robbery.

Defendant raises the following contentions on appeal: (1) that he was not proved guilty beyond a reasonable doubt; (2) that the trial court erred by allowing the jury to consider as substantive evidence a prior inconsistent statement of a prosecution witness identifying the defendant; (3) that the trial court erred by allowing his impeachment by the use of three alleged prior "convictions" where the record indicates that these were not properly introduced, that these were prior adjudications of delinquency rather than convictions, and that these were only two rather than three adjudications; (4) that he was denied a fair trial by the closing arguments of the prosecutor; and (5) that his sentence should be reduced because it was excessive and grossly disparate from that received by an accomplice.

We briefly summarize the relevant trial testimony. Sergeant William Biang testified that in the early morning hours of September 25, 1983, he responded to a call concerning a possible shooting in the 800 block of Prescott in Waukegan and found Jesus Rivera lying in the street in front of 812 Prescott with no pulse. Michael Blackwell testified that, while in his residence at 812 Prescott on September 25, 1983, he heard two "pops" or gunshots outside at about 1 a.m. He went to the window and saw Rivera lying face down in the street. Mr. Blackwell did not see anyone else in the area and did not hear any conversations outside prior to the "pops." Laura Cox and Maria Villalobos testified that they were with Rivera earlier in the evening at a bar near the scene of the incident. Maria also stated that when they exited the bar together, she noticed three or four black males hanging around in front

of an old store.

Leslie Webb, a 16-year-old, testified that he was with defendant and Michael Brown during the early morning hours of September 25, 1983, when he saw defendant shoot Rivera. Webb stated that earlier in the evening, Michael Brown came over to his house and they decided to go walking around. They then met up with Thomas Brown, a guy named Dennis, and "Amp," defendant's known nickname, who was wearing a blue hooded sweat shirt and a baseball cap. Webb recalled that while they were standing around, talking and drinking beer, he overheard defendant ask Michael Brown if he wanted to hold a gun. He also overheard defendant tell Michael that he wanted to rob a Puerto Rican. Webb, however, never saw the gun at this time.

Webb testified further that when they saw Rivera walking down Prescott, defendant took off after Rivera. He and Michael followed. When they caught up with Rivera, defendant pulled out a gun and said "stick-up." Rivera then advanced on defendant, backing him off momentarily. Michael kicked at Rivera to prevent Rivera from advancing on defendant any further. Defendant then shot twice striking Rivera with the second bullet. Defendant ordered Michael and Webb to remove the money from Rivera, but they refused. All three then ran to defendant's house. Webb recalled defendant entering the house with the gun, but he did not see the gun when defendant returned. All three then walked to Carolyn Dobbins' house, defendant's girlfriend, but were turned away by Carolyn's mother, who said Carolyn was asleep. Webb also testified that he gave a statement concerning the incident prior to the police dismissing the charges against him for his part in the shooting incident.

Michael Brown also testified that he saw defendant shoot Rivera. He stated that he had gone to Webb's house on the night of September 24 and that they went out walking. Along the way, they met up with defendant, Dennis, and Thomas Brown. Michael related to the jury that defendant said he was ready for the Kingsmen (a gang) and showed him a gun. Defendant was wearing a hooded sweat shirt and baseball cap on this night. While they were drinking some beer and hanging out in front of an old 7-11 store, defendant talked about robbing a Puerto Rican. They eventually saw Rivera walking down the street and approached him. Defendant said, "Stick-up, give me your money," while pointing a gun at Rivera. Michael recalled that he kicked at Rivera when Rivera, who appeared to be intoxicated, advanced upon defendant. Defendant then fired two shots at Rivera. Michael continued that, after Rivera fell, defendant told both Webb and himself to take any money off Rivera but they both refused. They ran to defendant's house

after the shooting and then walked to Carolyn Dobbins' house. Mrs. Dobbins answered the door and told defendant that Carolyn was in bed.

Michael also testified that even though defendant had fights with his brother in the past, he and defendant still went out and "hung around" together on occasion. In addition, he stated that although he pleaded guilty to the charge of armed robbery, testified at this trial in return for a lighter sentence, and was still waiting to be sentenced, he gave a signed statement to the police reiterating his trial testimony prior to making a "deal" to testify against defendant.

Thomas Brown testified that on the night in question, he was hanging out with defendant, Dennis, Webb, and his brother, Michael, drinking a quart of beer when he heard defendant state that they should jump a Puerto Rican. He testified further that when they saw Rivera walking down Prescott, defendant ran after Rivera. Webb and Michael Brown followed defendant. He further testified that Dennis and himself circled around the area where the incident occurred. He saw defendant tussling with Rivera and saw Michael Brown trying to push Rivera. He then stated that he only saw an arm extended, that he heard two shots fired, and that it was too dark to see who fired the gun. In addition, he could not remember what defendant was wearing that night.

After cross-examination, the State on redirect asked Thomas if he recalled telling Detective Juarez that he saw defendant run after Rivera, that he saw Rivera and defendant arguing, that he saw a gun in defendant's hand, and that he saw defendant fire the gun at Rivera. Thomas responded, Yes.

Defendant called Cicilio Vega, who testified that on the night of the incident, he was driving through the area when he heard a gunshot and went looking for it. He drove to 8th and Prescott and saw Rivera staggering in the street. He also saw one guy, then another guy, and still two more guys go running up to Rivera while a fifth guy, Leslie Webb, stood by and watched. He also testified that he knew defendant, although they are members of rival gangs, that he saw the man who shot Rivera, and that it was not defendant.

In addition, Vega testified that the first time he spoke with the police, he only said he saw two guys running away from Rivera and that he did not remember telling anyone that defendant shot Rivera. Later, Vega was recalled by the defense and stated that although he had testified earlier that he never told anyone that he saw defendant shoot Rivera, he now remembered that he had told a juvenile officer a few days prior to trial that he saw defendant shoot the gun. He lied to

the juvenile officer in order to set defendant up because of their gang rivalry.

Mega Dobbins, Carolyn Dobbins' mother, testified that she did not remember defendant coming to her house in the early morning hours of September 25, 1983. Maurice Dobbins, Carolyns' brother, testified that he was at home sleeping on September 25 and that he did not recall hearing anyone at the front door. Several other persons testified that they were with defendant at his home playing cards on the night of the incident. They also testified that defendant and Michael Brown's family did not get along.

Carolyn Dobbins testified that she is defendant's girlfriend and that on the night of September 24, she was with defendant at his house playing cards. She recalled that they remained there until about 12:30 a.m. when defendant walked her home where he stayed until after 1 a.m. In addition, she told the jury that she knew defendant and Michael Brown's family lived in the same building and did not get along. Further, she told the jury that when she was first questioned by police, she did not tell them that defendant was not with her on September 24 and 25.

Officer Miguel Juarez and Officer James Felton were called by defendant. Officer Juarez stated that Webb gave two different accounts of the occurrence when interviewed on two separate occasions. Officer Felton stated that Michael Brown never changed his story when he talked with the police, but he never mentioned that Thomas Brown was at the scene of the incident. David Woods, a friend of defendant, testified that about two months after the incident, he overheard Webb, Michael and Thomas Brown talking about setting someone up and he knew they were talking about defendant but he never gave this information to the police.

Defendant testified that he was at home playing cards on September 24 with his grandmother, brother, girlfriend, and some friends until about 12:30 a.m. He then left with Lisa Jones and Lisa Johnson to walk Carolyn home. He remained at Carolyn's for awhile and then went directly home. He testified that he did not get along with Michael Brown's family. He stated that he was not involved in the Rivera shooting. Additionally, he testified that he never told an Officer Henriquez that he was with his girlfriend on September 24 but he was not sure where he was.

In the State's rebuttal, Officer Richard Davis testified that he interviewed Carolyn Dobbins one month after the incident and on that occasion, she could not recall if she was with defendant on September 24. Further, he testified that he interviewed Cicilio Vega, who told him

that he saw Rivera lying on the ground at the scene, but did not see the shooting. Detective Ralph Henriquez testified that one week after the incident defendant stated that he was at home with his girlfriend getting "high" on the night of the incident. Officer Juarez was then recalled and testified that he interviewed defendant one month after the incident and defendant stated he was at his girlfriend's house when the incident occurred.

■ We choose to first address defendant's contention on appeal that error was committed where, following his taking the witness stand and testifying, three prior adjudications of delinquency in juvenile court were introduced and admitted into evidence as previous "convictions." The jury was subsequently instructed that the prior "convictions" could be considered as it may affect defendant's believability as a witness. In his appellate brief, defendant argues that error was committed in three respects. He maintains that the State failed to introduce authenticated copies of the adjudications, that the prosecutor misstated that there were three adjudications where only two findings of delinquency were involved, and that "the prosecutor's reference to the defendant's alleged convictions was a misstatement of law since they were no more than prior findings of delinquency."

Because we believe a substantial issue is presented concerning whether a prior adjudication of delinquency in juvenile proceedings is admissible for the purpose of attacking the credibility of an accused who testifies in a separate criminal case, we consider this argument first as its resolution may be dispositive of the question raised. In response to the defendant's argument on this point, the State contends any error regarding the use of defendant's previous adjudications of delinquency as prior convictions for impeachment purposes is waived for review by defendant's failure to object on this specific basis below.

A careful examination of the record indicates that not only was the sole objection by defendant's trial counsel to introduction of the prior adjudications on the specific basis that admission of such evidence should be limited to only one adjudication, but also counsel affirmatively stated he agreed the State was within the right to offer a prior adjudication of delinquency as a prior conviction. It is axiomatic that when a specific objection is made, all other grounds of objection are waived. (*People v. Rink* (1983), 97 Ill. 2d 533, 543, 455 N.E.2d 64.) Nevertheless, Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)) provides a limited exception to this rule of waiver where "[p]lain errors or defects affecting substantial rights" are involved although they were not brought to the attention of the trial court. *People v. Lucas* (1981), 88 Ill. 2d 245, 250-51, 430 N.E.2d 1091.

Defendant's appellate counsel, however, has failed to specifically request our invocation of the "plain error" doctrine. Instead, he briefly asserts that he was denied a fair trial by introduction of this evidence "where the credibility of the defendant is important" in this close case. In addition, the thrust of defendant's appellate contention on this issue is that the word "convictions" was used before the jury and in the instructions, whereas these were adjudications of delinquency. He argues the prosecutor misstated the law, but has not contended or advanced any citation of authority on appeal that a prior adjudication of delinquency is not admissible as impeachment evidence in a subsequent criminal trial following a defendant's taking the witness stand and testifying. While we might find a waiver of this issue for all these reasons, we conclude it is appropriate to consider now this alleged trial error, since a substantial question of error involving a fair trial is present and the matter may be raised in a different context under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1983, ch. 38, par. 122—1 *et seq.*). See *People v. Barnard* (1984), 104 Ill. 2d 218, 228-30, 470 N.E.2d 1005.

■■ While defendant has framed the issue in terms of whether the prosecutor's use of the word "convictions" was a misstatement of the law since they were adjudications of delinquency, the underlying question is whether a prior adjudication of delinquency in a juvenile court proceeding is admissible in a criminal trial as impeachment evidence where an accused testifies on his own behalf. Neither the State nor the defendant has cited or discussed section 2—10 of the Juvenile Court Act (Act) (Ill. Rev. Stat. 1983, ch. 37, par. 702—10), which we deem to be relevant.

Section 2—10 provides, in pertinent part, as follows:

"Sec. 2—10. Admissibility of Evidence and Adjudications in Other Proceedings. (1) Evidence and adjudications in proceedings under this Act shall be admissible:
* * *
(c) in proceedings under this Act or in criminal proceedings in which anyone who has been adjudicated delinquent under Section 2—2 is to be a witness, and then only for purposes of impeachment and pursuant to the rules of evidence for criminal trials; * * *."

Prior to the amendment to sections 2—9 and 2—10 of the Act by Public Act 82—973, effective September 8, 1982, there was no comparable provision in the Act allowing into evidence in a criminal proceeding an adjudication of delinquency for purposes of impeachment. Section 6 of Division XIII of the Criminal Code of 1874 (Ill. Rev. Stat. 1983, ch. 38, par. 155—1) allows, in the discretion of the trial judge, a prior "convic-

tion" of witnesses or a defendant to be shown for the purpose of affecting credibility of that witness. In *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, our supreme court approved the proposed Rule 609 of the Federal Rules of Evidence, and held it should be followed in the trial judge's exercise of discretion in determining whether to admit into evidence for impeachment purposes a prior conviction. Subsequent decisions have held that even though the final version of Rule 609 adopted by Congress was different from the proposed rule set out in *Montgomery*, the proposed rule was to be followed in Illinois courts (*People v. Stover* (1982), 89 Ill. 2d 189, 194, 432 N.E.2d 262; *People v. Yost* (1980), 78 Ill. 2d 292, 399 N.E.2d 1283), and the entire proposed Rule 609, even those provisions not specifically addressed in the *Montgomery* decision, should be followed. *People v. Ray* (1973), 54 Ill. 2d 377, 383, 297 N.E.2d 168.

The proposed Rule 609, adopted in *Montgomery* and as set out therein, provides in subsection (d) as follows:

" '(d) Juvenile Adjudications. Evidence of juvenile adjudications is generally not admissible under this rule. The judge may, however, allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible *to attack the credibility of an adult* and the judge is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.' " (*People v. Montgomery* (1971), 47 Ill. 2d 510, 517, 268 N.E.2d 695, 699.)

Until the amendment to sections 2—9 and 2—10 of the Juvenile Court Act by Public Act 82—973, effective September 8, 1982, the Act specifically provided that "[n]o adjudication, disposition or evidence given in proceedings under this Act is admissible as evidence against the minor *for any purpose whatever in any civil, criminal or other cause or proceeding* except in subsequent proceedings under this Act concerning the same minor." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 37, par. 702—9.) However, it has been held even before the amendment, notwithstanding the language in section 2—9, that a trial judge has discretion to allow evidence of a juvenile adjudication of delinquency to impeach a witness' general credibility in criminal proceedings where the criteria established by the proposed Rule 609 are satisfied. *People v. Puente* (1981), 98 Ill. App. 3d 936, 938-41, 424 N.E.2d 775; accord, *People v. Harrell* (1983), 112 Ill. App. 3d 241, 244-45, 445 N.E.2d 496.

With the amendment to sections 2—9 and 2—10 of the Juvenile Court Act, the legislature has now provided that a prior adjudication of delinquency shall be admissible "in criminal proceedings in which anyone who has been adjudicated delinquent *** *is to be a witness*, and

then only for purposes of impeachment and pursuant to the rules of evidence for criminal trials \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 37, par. 702—10(c).) A plain reading of the statutory language is that such adjudications are admissible where the person "is to be a witness." There is no language indicating that this provision applies where the criminal proceeding is one in which the defendant is testifying on his own behalf. Indeed, an interpretation of the statute to allow a prior adjudication of delinquency to be used for impeachment against a defendant who takes the stand in a criminal proceeding would be contrary to the decision in *Montgomery* which adopted the proposed Federal Rule 609. As stated above, subsection (d) of proposed Federal Rule 609 expressly limits impeachment through the use of evidence of a juvenile adjudication to a witness other than the accused.

In addition, section 2—10 provides that the use of such a prior adjudication is "pursuant to the rules of evidence for criminal trials." The *Montgomery* decision, in adopting proposed Federal Rule 609 in its entirety, established the rule of evidence for use of prior convictions and juvenile adjudications. Accordingly, pursuant to this authority, the admission into evidence of the accused's prior adjudications of delinquency in proceedings under the Juvenile Court Act was error.

■ As discussed above, the error which we have found was not specifically raised below and, although waived, we must determine if this is plain error requiring a reversal. The doctrine of plain error may be invoked in criminal cases where the evidence is closely balanced or where the error was of such magnitude that the accused was denied a fair trial. *People v. Lucas* (1981), 88 Ill. 2d 245, 250-51, 430 N.E.2d 1091.

Examination of the record reveals that defendant's prior adjudications of delinquency were introduced and admitted into evidence as prior "convictions." The trial court instructed the jury that defendant's prior "conviction" of an offense may be considered as it may affect his believability as a witness. (See Illinois Pattern Jury Instruction, Criminal, No. 3.13 (2d ed. 1981).) The prosecutor commented several times in his final arguments that the jury should consider the defendant's prior "convictions" as they affect his credibility as a witness. The evidence was closely balanced. There was no physical evidence of defendant's guilt, and the jury had to determine guilt or innocence from the sharply conflicting testimony of the various witnesses on both sides. Moreover, the State's evidence depended upon accomplice testimony which must be viewed with suspicion. (See *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.) Thus the credibility of the witnesses was particularly relevant and crucial, and the evidence of defendant's

prior adjudications of delinquency referred to as convictions, erroneously introduced, may have played an important part in the jury's decision.

Under the circumstances here, we cannot say that the improper impeachment did not prejudice the defendant's right to a fair trial. (See *People v. Schuning* (1985), 106 Ill. 2d 41, 48-49, 476 N.E.2d 423.) Defendant's judgments of conviction for murder and attempted armed robbery are reversed.

■ Where an appellate court reverses a criminal conviction for trial error, it may not remand for a new trial without first deciding a defendant's additional contention raised on appeal that the evidence at the first trial was insufficient to prove him guilty beyond a reasonable doubt. *People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366.

Under the facts here, however, we do not agree with defendant's contention that the evidence was insufficient to support the defendant's convictions. Defendant essentially argues that the State's evidence consisted of accomplices' testimony which was inconsistent, contained contradictions and discrepancies, was suspect because the accomplices received favorable treatment from the prosecution regarding charges against them, and was disputed by defense testimony. Nevertheless, the State's accomplice witnesses identified defendant as the perpetrator of the charged offenses. Although accomplice testimony must be viewed with suspicion, the resolution of defendant's guilt or innocence depended upon the credibility of the witnesses and the weight given their testimony, determinations exclusively within the province of the jury unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 260-62, 478 N.E.2d 267.) We conclude that there is sufficient evidence to support the jury's verdicts, and therefore it is appropriate to remand for a new trial.

Having determined that this matter must be reversed and remanded for a new trial, it is therefore unnecessary to consider the sentencing issues raised by defendant on appeal. As it is also unlikely that the other two alleged evidentiary errors will recur upon a new trial because of the context in which they arose in the original trial, we need not discuss them either.

For the foregoing reasons, the defendant's convictions are reversed, and the cause remanded for a new trial.

Reversed and remanded.

UNVERZAGT and SCHNAKE, JJ., concur.