THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN AVERY *et al.,* Defendants-Appellants.

First District (3rd Division)   No. 1—86—2418

Opinion filed February 15, 1989.

Randolph Stone, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellants.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Patricia Y. Brown, and Lauren E. Brown, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Defendants Steven Avery and Ramsey Lewis were found guilty of murder following a bench trial. The trial court sentenced Avery to a term of 20 years' imprisonment and sentenced Lewis to a term of 23 years' imprisonment. Defendants appeal, contending that the trial court erred in not suppressing their confessions after finding they were arrested without probable cause and that they were not proved accountable for the murder beyond a reasonable doubt.

Nathaniel Corley, a 16-year-old, was shot and killed at 2:15 a.m. on March 3, 1985. Defendants were subsequently charged along with Tracy Stofer. Avery and Lewis accused Stofer of shooting Corley, and Stofer countered that he drove the car and either Lewis or Avery shot Corley. Stofer's motion for severance was granted. (Stofer was also convicted, and this court has reversed that conviction and remanded for further proceedings. *People v. Stofer* (1989), 180 Ill. App. 3d 158.)

A joint hearing was held on the three codefendants' motions to suppress their statements made to the police. After the initial hearing, the trial court ruled that defendants were not under arrest when they were first taken to the police station for questioning. After two to four hours at the station, defendants were placed under arrest, but without probable cause. After a second hearing, the trial court concluded that the few hours between the illegal arrest without probable cause and the first inculpatory statement by Lewis, when probable cause to arrest arose, were sufficient to purge any taint. Thus, the motions to suppress defendants' statements were denied.

At the hearing on the motions to suppress, Stofer testified that on March 3, 1985, at 11 a.m., the police arrived at his home and took him down to the station to question him about the murder. Stofer told the officers that he had been at a party with Lewis and Avery the previous night.

Officers Barry Costello and John Yucaitas testified about the investigation and arrests. The shooting occurred at 2:15 a.m. The victim's mother informed Yucaitas of the names of Corley's friends. At 9 a.m., three of those friends, Eric Tate, Harry Elligan, and Tony Flemming, were brought to headquarters for questioning. They were separated. Tate told Yucaitas that on the night of the murder, the victim had told Tate, "Watch your back. Someone might shoot you." Tate and the victim left a dance and walked to McDonald's. At the dance, at McDonald's, and at a friend's house later, Tate saw three males in a gray, two-door Ford Escort hatchback, with papers in the window indicating the car was new. The car drove very slowly and appeared to be following them. Elligan told Yucaitas that he last saw the victim on Elligan's front porch at 2 a.m., talking with Elligan's cousin. Yucaitas gave this information to Dignan and Costello, who took over the investigation at about 10 a.m.

Dignan testified that on that day he and Costello interviewed Flemming. Flemming said that on the night before the March 3 murder, he and the victim were accosted by two black males. Flemming said he would try to find out their names. Flemming telephoned within an hour to report that he and a friend had looked through the

high school yearbook. They identified Stofer as one of the males who had chased them with a pole the night before the shooting.

Dignan and Costello went to Stofer's home, where they saw a gray Ford matching the description given by Tate. The officers took Stofer to the station for questioning. Stofer told the police that he had nothing to do with the murder and did not know Corley. On the previous night he had been driving around in the gray Ford hatchback along with Thomas Leatherwood and defendants. The officers left to find defendants.

At 1 p.m., Dignan and Costello went to Lewis' home, and a boy on the street pointed out where Lewis was standing on a porch. The officers told Lewis they wanted to talk to him about Corley's shooting. He agreed to go to the police station, where they spoke with Lewis in an interview room. Lewis informed the police that he and Stofer had been at a party and then drove around in the Ford until about 1:30 a.m. The officer told Lewis that Stofer gave a different version which mentioned other boys. Lewis agreed that Avery and Leatherwood were with them. The officers told Lewis "that we wanted to talk with Steven Avery, and we told him we'd get back to him." Lewis was left in the interview room with the door open. He was not told he could leave, or that he should remain, and was not handcuffed.

At 3 p.m., Dignan and Costello found Avery at his home. The officers told Avery's mother they were investigating the Corley shooting and that Stofer and Lewis were at the station, and they wanted to talk to Avery about the previous night's events. At the station, Avery told the police that on the previous night he was driven home at about 11:30 p.m. by Stofer, and he then went to bed. The officers told Avery that his friends reported a completely different story. Avery denied being with Leatherwood or Lewis.

At that time, about 5 p.m., all three codefendants were placed under arrest and given their *Miranda* rights for the first time. Prior to that, they had not been booked or processed in any way. The officers then spoke to defendants several times after the arrests. At one point, Avery began crying and stated that he was fearful of being killed if he spoke about the murder. At about 7 p.m., Lewis made statements incriminating the three codefendants.

At 8 p.m., Costello returned to Stofer and stated that defendants accused Stofer of shooting Corley. Stofer stated that he saw the victim on the street and defendants exited Stofer's car and confronted Corley. Stofer exited the car, heard several shots, and then they all returned to the car. Avery or Lewis later threw the gun out the win-

dow.

At 9:45 p.m., a formal court-reported statement was taken from Lewis. At 10:17 p.m., Avery's statement was taken. At 11:03 p.m., Stofer's formal statement was taken.

Dignan admitted that a progress report stated Lewis was arrested at 1 p.m. at his home address. The progress report stated that Avery was arrested at 3 p.m. near his home address. Dignan explained that those were the times and locations where defendants were "taken into our custody."

The trial court held that there was no arrest when Avery was picked up, Avery at his home and Lewis on the street. The court relied on several factors as indications that the police did not manifest an intent to arrest defendants when they asked them to come to the station. The court pointed out that the police did not search defendants, handcuff them, give them *Miranda* rights, fingerprint them, or photograph them. The court found, however, that the station house arrest at 5 p.m. was without probable cause.

At a separate attenuation hearing, Dignan testified that after the three codefendants gave conflicting stories, they were arrested. Subsequently, he spoke with Avery, who began crying. Avery said, "I knew this would happen. If I tell you, they will kill me." Dignan informed Costello that Avery was upset, and Avery was then taken downstairs to the lockup to give him time to compose himself. After Avery was fingerprinted and photographed, Dignan took him back to the interview room.

Costello then informed Dignan that Lewis reported he had participated in Corley's murder and that Stofer and Avery had gotten out of the car and shot and killed Corley. Costello showed Dignan handwritten notes signed by Lewis. Dignan then returned to Avery. He gave Avery his *Miranda* rights and then showed Avery the statement signed by Lewis.

Avery stated to Dignan that the three codefendants followed Corley around the neighborhood during the night of the shooting. They located Corley. Avery first said that Stofer and Lewis got out of the car alone and he remained behind. He heard gunshots and Lewis and Stofer returned to the car. Stofer said, "I think I got him."

Avery then said, "Wait a minute. I want to tell you the truth. I don't want to lie. Lewis Ramsey [sic] was not telling the whole truth. We all got out of the car, all three of us." They caught up with the victim by a viaduct. Stofer pulled out a gun. Corley looked at Stofer, raised his hands and said, "No, wait a minute. Wait a minute. Hold on." Avery began to turn around and looked back and saw Stofer fire

four times. They ran back to the car, and Stofer said, "I think I got him." Avery stated further that he did not know Corley had a gun.

Costello returned to talk with Lewis and confronted him with Avery's latest statement. Lewis agreed that all three men got out of the car and confronted the victim, and that Stofer had shot and killed Corley.

Costello then returned to Stofer and confronted him with defendants' statements. Stofer stated that they approached Corley by the viaduct and saw him reach into his pocket. Stofer then heard shots coming from both sides. They ran back to the car and at some point either Lewis or Avery threw the gun out the passenger's window. Subsequently, all three codefendants gave court-reported statements to an assistant State's Attorney.

The trial court determined that sufficient intervening factors occurred to purge the statements of the taint of the illegal arrests.

At trial, Tate testified that on March 2, 1985, he spent the evening with the victim, Flemming and Elligan. At several places he saw a new gray Ford Escort with three people in the car. Dignan and Costello testified as to the statements made by the codefendants to the police.

Lewis testified that his statement was true but incomplete. They had been drinking, and Lewis did not know there was a gun in the car. He assumed they were just going to fight the victim. He followed Avery and Stofer out of the car because he was curious. He saw Stofer take something from under the seat and put it in his belt, but he did not know what it was. When Stofer started shooting, Lewis turned and ran with Avery.

Defendants contend that their confessions resulted from illegal arrests, and therefore, should have been suppressed at trial. The State counters that defendants voluntarily agreed to accompany the police officers in order to help with their investigation, and therefore, no arrest occurred; that the arrest at 5 p.m. was supported by probable cause; and that even if the arrests were illegal, the confessions need not be suppressed where the taint was sufficiently purged by intervening circumstances.

■■■ We hold that the trial court erred in finding that no arrest occurred when defendants were first taken into custody for questioning.

An arrest occurs when the police inform defendant of a violation, defendant submits to their control, and it is clear that the police intend to arrest defendant and that defendant understands he is being arrested. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 475 N.E.2d

915.) The fourth amendment provides that all persons are protected against unreasonable searches and seizures. When no "seizure" occurs, no fourth amendment rights have been infringed. *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319.

The test for whether a person has been seized within the meaning of the fourth amendment is whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. (*Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975; *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) The test is intentionally imprecise because it focuses on the coercive effect of police conduct taken as a whole, and not on each particular detail of the police conduct in isolation. *Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975.

The police may not detain suspects for station house questioning absent probable cause to arrest. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) In *Dunaway,* the teenage defendant was taken from his home in a police car to the station and was not informed he was free to leave. The Court found it was a custodial interrogation which required probable cause, despite the absence of the "trappings of a technical formal arrest." *Dunaway,* 442 U.S. at 215-16, 60 L. Ed. 2d at 838, 99 S. Ct. at 2258. See also *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046 (defendant effectively under arrest where he accompanied police to station and he was questioned over a 12-hour period).

Similarly, the police located defendants at or near their homes and brought them to the station for interrogation about their involvement in the murder. Dignan testified defendants were "taken into custody" at that time. The arrest reports show that 1 p.m. and 3 p.m. and defendants' home addresses were the times and places of arrest.

At the station, defendants were not told they were free to leave. They could reasonably believe they could not leave, especially when each defendant was left in an interrogation room and simply told the officers would "get back to him." This added to a reasonable belief that they were under arrest. See *Dunaway v. New York*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319; *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103; *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 438 N.E.2d 222; *People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781.

Defendants were kept in interrogation rooms for 8 and 10 hours. They were left alone for hours at a time. In the meantime, the offi-

cers continued the investigatory process. Defendants were questioned intermittently until they finally made inculpatory statements.

Moreover, the officers' subjective belief that defendants were free to leave is not determinative where it was not communicated to defendants. *United States v. Mendenhall* (1983), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870; *People v. Hardway* (1987), 163 Ill. App. 3d 596, 516 N.E.2d 830; *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876.

We hold that the trial court erred in finding that no arrest occurred when defendants were first taken to the police station. The show of official authority was such that a reasonable person would not have believed he was free to leave. (*Michigan v. Chesternut*, 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975; *United States v. Mendenhall*, 446 U.S. 544, 84 L. Ed. 2d 497, 100 S. Ct. 1870.) Consequently, any evidence resulting from the statements defendants made to the police would be inadmissible.

The trial court properly found, however, that there was no probable cause to arrest defendants at 5 p.m. Probable cause to arrest exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that a crime has been committed by the person being arrested. *Dunaway v. New York*, 442 U.S. 200, 80 L. Ed. 2d 824, 99 S. Ct. 2248.

At 5 p.m., the police knew only that defendants had been riding in a certain gray car the previous night and that defendants differed as to who accompanied Stofer on the night of the crime. This is insufficient to establish probable cause to arrest defendants for murder. None of the three codefendants confessed to any knowledge of, or participation in, the murder. It was not until Lewis implicated all three boys that probable cause arose. (See *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33.) We agree with the trial court that there was no probable cause to arrest defendants at 5 p.m. (See *People v. Nash* (1979), 78 Ill. App. 3d 172, 397 N.E.2d 480.) Consequently, there was no probable cause to arrest defendants at 1 p.m. or 3 p.m.

The determination that an illegal arrest has occurred is not dispositive of the issue of the admissibility of a subsequent confession. The relevant inquiry is whether the confession was obtained by exploitation of the illegality of his arrest. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The evidence need not be suppressed if it was obtained by means sufficiently distinguishable to be purged of the primary taint. *People v. White* (1987), 117 Ill. 2d 194,

512 N.E.2d 677, quoting *Wong Sun v. United States* (1963), 371 U.S. 471, 487-89, 9 L. Ed. 2d 441, 455-56, 83 S. Ct. 407, 417-18.

■ The threshold requirement for fourth amendment analysis is whether or not the proper *Miranda* warnings were given. Where the fifth amendment has been violated, the fourth amendment issue need not be reached. (*Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) Defendants were not given their *Miranda* rights at the time of their 1 p.m. or 3 p.m. arrests, but were given those rights at 5 p.m. There is no contention that the statements were otherwise involuntary. See *People v. Ealy* (1986), 146 Ill. App. 3d 557, 497 N.E.2d 101.

■ Beyond the threshold requirement of voluntariness, our analysis focuses on the causal connection between the illegality and the confessions. (*Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The Court in *Brown* identified several factors as particularly important to evaluate the admissibility of confessions obtained after illegal arrests. These factors are the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purposefulness and flagrancy of the official misconduct. (*Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The burden of showing admissibility rests upon the State. *Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

■ The temporal proximity here between Lewis' 7 p.m. confession implicating all three defendants, and Lewis' 1 p.m. and Avery's 3 p.m. arrest was six and four hours, respectively. Considering the surrounding circumstances of the investigatory, custodial interrogation, these time periods were insufficient to attenuate the illegal arrest. See *People v. Stofer* (1989), 180 Ill. App. 3d 158.

■ In attempting to establish attenuation, the State argues that intervening circumstances occurred when each defendant was confronted with his companions' statements. The confrontation of an arrestee with untainted evidence may constitute an independent intervening circumstance. (*In re R.S.* (1981), 93 Ill. App. 3d 941, 418 N.E.2d 195.) Confrontation with incriminating evidence purges the taint of an illegal arrest, however, only where the evidence itself is not a product of the illegal arrest. (*Taylor v. Alabama* (1982), 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664; *People v. Franklin* (1987), 115 Ill. 2d 328, 504 N.E.2d 80; *People v. Thomas* (1984), 123 Ill. App. 3d 857, 463 N.E.2d 832; *People v. Nash* (1979), 78 Ill. App. 3d 172, 397 N.E.2d 480. Defendants' statements were extracted after being confronted with their codefendants' statements. Avery and Lewis were arrested, however, as a result of Stofer's illegal arrest.

The court in *State v. Winegar* (1985), 147 Ariz. 440, 711 P.2d 579, rejected the State's argument that intervening circumstances were present because a codefendant's statement was presented to defendant at some point between defendant's illegal arrest and his confession. The court found that the confrontation with the codefendant's statement was itself the result of defendant's illegal arrest and could not intervene to purge the taint of the arrest. (*State v. Winegar,* 147 Ariz. at 449, 711 P.2d at 588.) We agree with this holding. Confronting defendants with statements from each other and Stofer, all of whom were illegally arrested, did not constitute an intervening event which purged the taint of the illegal arrests. *Cf., e.g., People v. Gabbard* (1979), 78 Ill. 2d 88, 398 N.E.2d 574; *People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221; *People v. Malloy* (1982), 104 Ill. App. 3d 605, 432 N.E.2d 1291; *People v. Tankson* (1980), 92 Ill. App. 3d 328, 415 N.E.2d 1218.

■■ The final factor to be considered under *Brown* is the purposefulness and flagrancy of the official misconduct. An arrest has a quality of purposefulness where, *e.g.,* it is an expedition for evidence admittedly undertaken in the hope that something might turn up. (See, *e.g., Taylor v. Alabama,* 457 U.S. 687, 73 L. Ed. 2d 314, 102 S. Ct. 2664; *Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *Brown v. Illinois,* 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The purpose of suppressing evidence obtained as a result of police conduct which is purposeful and flagrant is to prevent similar conduct on the part of the police in the future and to deny them any benefit from such conduct. *People v. Dortch* (1982), 109 Ill. App. 3d 761, 441 N.E.2d 100.

Here, the police conducted themselves in such a manner that demonstrates they were questioning many people in the hope something would turn up. Throughout the investigatory process, the police repeatedly "rounded up" teenagers in the area to attempt to gather any potentially relevant information. We find the taint emanating from the illegal arrests was not dissipated or attenuated.

■■ We conclude that the trial court's determination of attenuation is contrary to the manifest weight of the evidence. (See *People v. Lekas,* 155 Ill. App. 3d 391, 508 N.E.2d 221; *People v. Davis* (1980), 86 Ill. App. 3d 557, 407 N.E.2d 1109.) The court erred in admitting the confessions on the basis that there was sufficient attenuation between the illegal arrest and the confessions. We therefore remand for further proceedings, where the confessions must be suppressed.

■■ Because we reverse the conviction for trial error, we must decide whether the evidence at the first trial was sufficient to sustain

the conviction. (*People v. Brooks* (1987), 115 Ill. 2d 510, 505 N.E.2d 336; *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366; *People v. Massie* (1985), 137 Ill. App. 3d 723, 484 N.E.2d 1213.) Double jeopardy is not a bar where, as here, reversal is the result of trial error. *Burks v. United States* (1978), 437 U.S. 1, 57 L. Ed. 2d 1, 98 S. Ct. 2141. See also *People v. Stofer*, 180 Ill. App. 3d 158 (and cases cited therein).

██ Retrial is permitted even where the evidence remaining after discounting the erroneously admitted evidence is insufficient to sustain a verdict. (*Lockhart v. Nelson* (1988), 488 U.S. ___, 102 L. Ed. 2d 265, 109 S. Ct. 285.) A reversal based on trial errors such as the incorrect receipt of evidence implies nothing with respect to defendant's guilt, but merely determines that he was convicted through a judicial *process* which is defective in some fundamental respect. (*Lockhart v. Nelson*, 488 U.S. at ___n.8, 102 L. Ed. 2d at 274 n.8, 109 S. Ct. at 291 n.8, citing *United States v. Tranowski* (7th Cir. 1983), 702 F.2d 668, and *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366. See also *People v. Stofer*, 180 Ill. App. 3d 158 (and cases cited therein).) All evidence submitted at the original trial may be considered in determining the sufficiency question for double jeopardy purposes. *Lockhart v. Nelson*, 488 U.S. ___, 102 L. Ed. 2d 265, 109 S. Ct. 285; *People v. Stofer*, 180 Ill. App. 3d 158 (and cases cited therein).

In *People v. Taylor,* the conviction was reversed because the confession should have been suppressed. The court first found it was error for the appellate court not to reach the question of whether the evidence adduced at trial was sufficient to sustain defendant's conviction for armed robbery. (Accord *People v. Brooks,* 115 Ill. 2d 510, 505 N.E.2d 336.) The court instructed the appellate court to review all the evidence introduced at the first trial.

██ We believe there was sufficient evidence for the trier of fact to conclude defendants were guilty beyond a reasonable doubt. While we make no finding as to their guilt or innocence which would be binding on retrial, we merely consider the sufficiency of the evidence so as to remove the risk of subjecting defendant to double jeopardy. (*People v. Taylor,* 76 Ill. 2d 289, 391 N.E.2d 366; *People v. Wilson* (1986), 146 Ill. App. 3d 567.) In so holding, we point to the codefendants' statements.

Each of the three defendants accused one or both of the others of committing the murder. We do not decide in this opinion whether the codefendants' statements would be admissible in a new trial of defendants. (See *People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d

998; *People v. Lekas,* 155 Ill. App. 3d 391, 508 N.E.2d 221.) Thus, we will not address the question of whether defendants will have derivative standing to raise fourth amendment objections to the others' confessions. See *Alderman v. United States* (1969), 394 U.S. 165, 22 L. Ed. 2d 176, 89 S. Ct. 961 (codefendants have no special standing and fourth amendment personal rights may not be vicariously asserted; not necessary to exclude evidence against one defendant in order to protect rights of another); see also *People v. Pierce* (1973), 13 Ill. App. 3d 939, 301 N.E.2d 330; *People v. Pohlmann* (1973), 13 Ill. App. 3d 779, 300 N.E.2d 301; see generally 4 W. LaFave, Search and Seizure §11.3(i) (2d ed. 1987).

In light of the holdings made herein, we need not decide the remaining issue of accountability.

For the foregoing reasons, the judgments of the circuit court of Cook County are reversed, and the causes are remanded for further proceedings consistent with the holdings stated herein.

Reversed and remanded.

FREEMAN, P.J., and WHITE, J., concur.