THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SANTOS FLORES, Defendant-Appellant.

First District (6th Division)   No. 1—98—2036

Opinion filed July 14, 2000.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Linda D. Woloshin and LaTisha Foster, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

Following a jury trial, defendant, Santos "Shorty" Flores, was convicted of armed robbery and first degree murder. He was sentenced to 30 years for armed robbery and 60 years for first degree murder, the sentences to run consecutively. Defendant appeals.

On appeal, defendant contends the circuit court erred in that: (1) defendant's confession should have been suppressed; (2) defendant was denied effective assistance of counsel; (3) defendant's sentences were excessive; and (4) defendant's sentences should run concurrently rather than consecutively.

At trial, the testimony revealed that the victim, Ted Kontzias, operated Alfa Restaurant Supply Company at 4318 North Elston in Chicago, on the northwest corner of Elston and Berteau. Usually, at the end of each day, the victim took the day's money proceeds and paperwork home, but on December 13, 1995, the date of the incident, the victim's wife took the money home around 8:15 p.m.

James Radkins testified that shortly before 9 p.m. that evening, he arrived with his family at their family home at 4150 North Springfield, at the intersection of Springfield and Berteau, across the street from the Alfa Restaurant Supply Company parking lot. Radkins' wife was driving and entered the alley off Berteau to access their garage. Radkins saw a gray compact car, with its lights on and motor running, blocking the garage. The gray car moved slowly down the alley, pulled over, and parked about six or seven houses down. Radkins investigated the gray car, walked past where it had stopped and noticed the car was a gray Honda with license plate number CPP 816. Radkins then told his wife to call the police and report a suspicious car in the area, and she did.

Radkins further testified that at about 9 p.m. he heard gunshots coming from the direction of Elston Avenue. His neighbor ran out of his house and said somebody had been shot. Radkins went to the alley and saw computer papers and ledger sheets, which he had not seen before. Radkins then went to the Alfa Restaurant Supply parking lot and saw the victim on the ground. Radkins talked to police and reported the license number of the gray Honda.

Another witness, Sargon Albazi, testified that he was traveling northbound on Elston Avenue when he heard a couple of gunshots coming from a parking lot on the left-hand side of Elston prompting him to make a U-turn into the parking lot. Albazi saw a man in the parking lot who was holding his stomach or chest and who was sinking to his knees. Albazi glanced at two males running through an alley. He could not see their faces but noticed they were wearing dark clothes, which contrasted with the falling white snow. The man in the parking lot was yelling for help. Albazi went to a nearby police station and told two officers about what he had seen. The officers followed Albazi to the scene, where the victim was lying on the ground with people aiding him.

Officer Christine Caraballo testified she was one of the officers whom Mr. Albazi summoned to the scene, that she found the victim shot in the chest, bleeding, lying in the snow in the parking lot. After summoning an ambulance, Officer Caraballo and her partner knelt down and asked the victim what happened. The victim said that two men approached him and told him to give them his money. He said he did not have any. They shot him, took his papers, and ran.

Officer Granias testified that he also went to the scene. After interviewing Radkins, Albazi and another witness, Mr. Bradke, Officer Granias toured the area, looking for a gray Honda with tinted windows bearing license plate CPP 816, and for two male Hispanics wearing dark "hoodies."

Dr. Eupil Choi testified the victim died of two gunshot wounds to the chest.

An evidence technician testified that on the evening of December 13, 1995, he found snow on the ground and "paperwork" lying behind the garage at 4150 N. Springfield, consisting of computer printouts, invoices and other papers.

Gloria Ortiz, girlfriend of codefendant Nelson "Coco" Rivera, testified that she lived at 1839 North Harding in Chicago with Nelson Rivera, Nelson's brother David Rivera, and David's wife, Miriam. She testified Nelson and defendant were members of the Maniac Latin Disciples and that David Rivera owned a gray Honda with tinted windows. She further testified that, on the evening of December 13, 1995, Nelson came home looking pale and said that he shot someone. Shortly thereafter, defendant walked in and Gloria asked him what was going on. Defendant said they tried to rob an old man, that Nelson shot him and that it happened near Pulaski and Irving Park. Defendant seemed upset that Nelson had shot the man. Nelson admitted to Gloria that he should not have shot the person.

Gloria and Miriam left in the gray Honda, with Gloria at the wheel, and went to Irving Park and Pulaski to "see what really happened." Officer Granias stopped the car, arrested Gloria and Miriam and took them to a police station for questioning. After a conversation with Gloria, Officer Granias went to 1839 North Harding in Chicago, arriving at 10 p.m. Officer Granias looked in the front window and saw people milling around, including a tall subject in a white T-shirt, and two other male Hispanic subjects wearing black or dark "hoodies." David, Nelson and defendant were all arrested and taken to Area 5 headquarters. There, they were processed and placed in separate small, windowless interrogation rooms for questioning.

The testimony revealed that police spoke with Nelson at 2 a.m. and with defendant at approximately 2:30 a.m. and gave both *Miranda* warnings. Nelson said he wished to make a statement; defendant said he did not wish to speak with police without an attorney present. Nelson gave a statement to police and two assistant State's Attorneys at 5:05 a.m.

The testimony revealed that, at approximately 8:50 a.m., defendant asked to use the restroom. After defendant used the restroom, a detective escorted him back to the interview room. On the way, defendant stopped at a drinking fountain, looked around, and asked the detective "what was going on." The detective "told him there were a number of State's Attorneys in the office who were reviewing the case, they were deciding who was going to be charged, and what charges were going to be placed." According to the detective, defendant then responded, "Get those State's Attorneys in. I want to talk to them."

Defendant then gave a statement. In it, defendant admitted he was a Maniac Latin Disciple and that Nelson "Coco" Rivera was also a Maniac Latin Disciple. Defendant admitted he knew Nelson's brother, David. He stated that, prior to the incident, he and Nelson discussed robbing the man at Alfa Restaurant Supply, who, Nelson said, would have money in a briefcase. They planned to wait until all five company trucks came in and everybody left because, at that point, the man would exit with the cash. Defendant's "job" was to take the money; Nelson's "job" was to "put the gun on him." They planned to use David Rivera's car.

Defendant's statement indicated further that, following this discussion, the defendant, together with Nelson and David, went straight to the "factory," i.e. , "Alfa's." When they saw only one truck in the parking lot, they left. They returned at about 6:30, saw two trucks, and left again to get beer. The trio returned again, saw three trucks, and left a third time, to get food. When the trio returned, there were four trucks in the parking lot. David parked the Honda on the same side of the street as the "factory" and observed the employees pull all the trucks into the lot and leave in cars. Defendant's statement also indicated that, shortly thereafter, Nelson told David to park by the alley. Nelson and defendant exited the Honda and waited across the street for "the old man" to come out. When Nelson saw the victim come out of the building, Nelson said "come on—he's coming now." Armed with a .25, Nelson crossed the street toward "an empty lot." Defendant went with him. Nelson confronted the victim and told him "give me the money." The victim turned and defendant grabbed his papers. The victim then pushed Nelson's gun hand. Nelson got scared that the victim was trying to snatch the gun, so Nelson shot him. The man began to yell "help help" and defendant became very scared and left. Nelson and defendant went to the alley, "dropped the papers," threw the gun over a fence, jumped into the Honda and went home. Back home, Nelson looked pale and said he shouldn't have shot the man.

Defendant's statement was published to the jury. The circuit court had previously denied defendant's pretrial motion to suppress his statement.

■ On appeal, defendant first contends his confession should have been suppressed because it was given after he had requested counsel and in response to a statement made by police that was reasonably likely to prompt an incriminating statement. A motion to suppress statements presents the court with a mixed question of law and fact. *People v. Kidd*, 175 Ill. 2d 1, 25-26, 675 N.E.2d 910 (1996). Where the facts are essentially uncontroverted and the credibility of witnesses is

not at issue, *de novo* review is appropriate. *People v. Oaks*, 169 Ill. 2d 409, 447-48, 662 N.E.2d 1328 (1996). Here, the facts surrounding defendant's statement are not in dispute; thus, *de novo* review is appropriate.

■ A criminal defendant has a constitutional right to counsel at all custodial interrogations. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 10; *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966); *People v. McCauley*, 163 Ill. 2d 414, 645 N.E.2d 923 (1994). Once a defendant invokes that right, the police cannot interrogate him "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1885 (1981). A request for counsel "raise[s] the presumption that he is unable to proceed without a lawyer's advice." *Arizona v. Roberson*, 486 U.S. 675, 683, 100 L. Ed. 2d 704, 714, 108 S. Ct. 2093, 2099 (1988). Thus, it is presumed that any waiver has "come at the authorities' behest" (*Roberson*, 486 U.S. at 681, 100 L. Ed. 2d at 713, 108 S. Ct. at 2097), and the State bears a "heavy burden" to prove that a waiver of counsel following invocation of that right was knowing and intelligent (*People v. Washington*, 68 Ill. 2d 186, 369 N.E.2d 57 (1977)).

■ Where, as here, the issue is whether the "accused himself initiated further communication" (*Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 77 L. Ed. 2d 405, 412, 103 S. Ct. 2830, 2834 (1983)), the preliminary inquiry is whether, under the totality of circumstances, the defendant initiated the conversation in a manner evincing a "willingness and desire for a generalized discussion about the investigation" (*People v. Olivera*, 164 Ill. 2d 382, 391, 647 N.E.2d 926 (1995)). If the defendant's comment or question does not express a desire for a generalized discussion about the investigation, the officer must not respond in a manner which police should know is reasonably likely to elicit an incriminating response. *Olivera*, 164 Ill. 2d at 391-92, 647 N.E.2d at 930, citing *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). In determining whether a statement by police is reasonably likely to elicit such a response, the focus is primarily upon the perceptions of the suspect rather than upon the intent of the police. *Olivera*, 164 Ill. 2d at 392, 647 N.E.2d at 930.

In *People v. Olivera*, 164 Ill. 2d 382, 647 N.E.2d 926 (1995), Olivera surrendered to police in relation to a shooting investigation. The arresting officer advised Olivera of his *Miranda* rights, and Olivera invoked his right to counsel. Later, another officer placed Olivera in a lineup, after which Olivera asked the officer "what happened?" *Olivera*, 164 Ill. 2d at 387, 647 N.E.2d at 929. The officer responded that the defendant had been " 'positively identified' " whereupon the de-

fendant inquired what would happen next. *Olivera,* 164 Ill. 2d at 387, 647 N.E.2d at 929. The officer advised Olivera of his rights a second time, then Olivera stated he had not been alone when he shot the victim. The Illinois Supreme Court held that the defendant's inquiry about the results of the lineup did not evince a "desire for a generalized discussion concerning the investigation," which constituted a knowing and intelligent waiver of his *Miranda* rights. *Olivera,* 164 Ill. 2d at 390-91, 647 N.E.2d at 930. In so holding, the Illinois Supreme Court contrasted *Olivera* with *Bradshaw,* in which the response of the officer to the defendant's question was held to be proper and not reasonably likely to elicit an incriminating response.

In *Bradshaw,* when the defendant asked, " 'Well, what is going to happen to me now?' " the officer responded with a warning rather than with information. *Bradshaw,* 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833. He stated, " 'You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you so desire because anything you say—because—since you have requested an attorney, you know, it has to be at your own free will.' " *Bradshaw,* 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833.

■ Here, defendant asked to use the restroom after being at the police department overnight. Upon exiting, defendant observed several people in the room and asked the detective what was going on. The detective "told him there were a number of State's Attorneys in the office who were reviewing the case, they were deciding who was going to be charged, and what charges were going to be placed."

The police response in *Olivera* and the police response here are strikingly similar. Each provided the defendant with new information rather than reiterating his rights; each contained information about the investigation of the case for which defendant was a suspect; each concerned evidence or the amount of evidence to focus the investigation upon the defendant. Admittedly, it is human nature to answer a person's question, but in *Olivera,* the supreme court established the standard of conduct by police and determined that when deciding whether a statement by police is reasonably likely to elicit an incriminating response, the focus is primarily upon the perceptions of the suspect rather than upon the intent of the police.

Thus, with no aspersions to the detective, we find the detective's statement was more akin to the statement made by the officer in *Olivera,* which the Illinois Supreme Court found to be improper, than to the warning made by the officer in *Bradshaw,* which the United States Supreme Court found to be proper. Following *Olivera,* we conclude that the detective's statement was reasonably likely to elicit an in-

criminating response after defendant had requested counsel and, thus, violated *Miranda*. The circuit court erred in denying defendant's motion to suppress the statement.

■ Having found error in the circuit court's denial of the defendant's motion to suppress, we consider whether the cause may be remanded for a new trial. The double jeopardy clause precludes a second, or successive, trial for the purpose of affording the prosecution another opportunity to supply evidence it failed to muster in the first proceeding. *Burks v. United States*, 437 U.S. 1, 11, 57 L. Ed. 2d 1, 9, 98 S. Ct. 2141, 2147 (1978). However, it does not preclude retrial of a defendant whose conviction has been set aside because of an error in the proceedings leading to the conviction providing the evidence introduced at trial was legally sufficient to convict. *People v. Mink*, 141 Ill. 2d 163, 172-73, 565 N.E.2d 975 (1990). Because defendant's conviction is set aside on account of a trial error, we consider whether the evidence at trial was sufficient to convict.

The relevant question to ask in reviewing the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49, 538 N.E.2d 461 (1989). Retrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted; for purposes of double jeopardy, all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence. *Lockhart v. Nelson*, 488 U.S. 33, 40, 102 L. Ed. 2d 265, 273, 109 S. Ct. 285, 290 (1988); *People v. Avery*, 180 Ill. App. 3d 146, 157, 534 N.E.2d 1296 (1989).

Here, eyewitnesses described the perpetrators as three Hispanic males wearing dark clothes and driving a gray Honda with license plate number CPP 816. Police promptly located this Honda in the vicinity of the crime scene and questioned its driver, Gloria Ortiz. Ortiz led police to defendant, a Hispanic male wearing a dark "hoodie," and later testified against him. According to Ortiz's testimony, on the evening of the incident, defendant told her that he, together with David and Nelson Rivera, had tried to rob an old man, that Nelson shot the old man and that the incident happened near Pulaski and Irving Park. The victim, an elderly male suffering from a fatal gunshot wound, was found in the parking lot of his business at Elston and Berteau, a short distance from the Pulaski and Irving intersection. This evidence, standing alone, was sufficient to sustain the verdict against defendant; defendant's statement to police was helpful but unnecessary. Accordingly, we remand the cause to the circuit court for retrial.

*People v. Birdsall*, 172 Ill. 2d 464, 480, 670 N.E.2d 700, 708 (1996); *Mink*, 141 Ill. 2d at 173-74, 565 N.E.2d at 979-80.

Because we remand for a new trial, defendant's remaining issues regarding ineffective assistance of counsel and sentencing are moot, and plaintiff's motion to supplement the record with the psycho-social history, psychological summary, and psychiatric summary prepared by Forensic Clinical Services, which was taken with the case, is denied.

Reversed and remanded.

CAMPBELL and BUCKLEY, JJ., concur.