THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CALVIN C. PIERCE, Defendant-Appellant.

Second District No. 2—89—0741

Opinion filed December 5, 1991.—Modified on denial of rehearing January 24, 1992.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Anna Ahronheim and Michael J. Pelletier, both of State Appellate Defender's Office, of Chicago, for appellant.

Daniel A. Fish, State's Attorney, of Dixon (William L. Browers and Marshall M. Stevens, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Calvin C. Pierce, was found guilty of five counts of first degree murder. A jury found defendant guilty of two counts of felony murder predicated upon the commission of an aggravated battery, one of which involved causing harm to a person over the age of 60 years (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)), and three counts of first degree murder creating a strong probability of death or great bodily harm (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2)).

On appeal, defendant presents the following issues for review: (1) whether defendant was denied his constitutional right to the effective assistance of counsel; and (2) whether the court improperly relied upon the death of the victim in imposing a 60-year sentence. We affirm in part, vacate in part, and remand the cause for resentencing.

At approximately 9 a.m., November 2, 1988, the body of 80-year-old Carrie Duncan (Duncan) was discovered near a road in southeastern Lee County. Carrie Duncan was 4 feet 10 inches tall and weighed approximately 100 pounds. She received multiple stab wounds to her abdomen, chest, and back. She also received multiple blows to the head, including both sides of the forehead, the ears, and the back of the head under the scalp. Her death was caused by blood loss due to an incised wound of the liver resulting from stab wounds to the abdomen, and blunt trauma to the head, resulting in swelling of the brain and hemorrhaging around the brain. Her body was in a grassy area surrounded only by grain bins and utility poles and not immediately apparent from the main road. Her purse rested 60 feet south of her

body and could be seen from the road. A broken dental plate and a common serrated steak knife were in the same area as the purse.

The facts below provide a brief history of this case. Additional facts will be provided in order to understand the individual issues as they are discussed.

While investigating the circumstances surrounding the death of Duncan, a detective with the Lee County sheriff's department (Blake) learned that defendant was friends with the victim and did yard work for her. Based upon this information, the detective decided to speak with defendant about Duncan's death. Defendant agreed to speak with the police and shortly thereafter gave an oral confession, signed a *Miranda* waiver and repeated a confession on a tape recording.

In his taped confession, defendant stated that he and his girl-friend, Kathy Bennett (Bennett), drank beer at two taverns during the late evening and early morning of November 1 and 2. After leaving the taverns, defendant and Bennett stopped to pick up Duncan in order to take her out for breakfast. On the way to the restaurant, an argument took place, and defendant pulled off the road to get things straightened out. Defendant then stated that he kicked Duncan with his boot and stabbed her in the back once.

At defendant's trial, defendant's story differed from his taped confession. He testified that he pulled off the road simply to go to the bathroom. At that time, Bennett emerged from the rear of the truck they were driving in and pushed Duncan to the ground. Defendant stated he then saw Bennett kicking and stabbing Duncan. Defendant testified that the attack continued for approximately 15 to 20 minutes and that he did not intervene. Defendant testified that Bennett told him to take the blame. Defendant testified that after Duncan had been stabbed defendant took the knife from Bennett, but then gave it back to her. Defendant stated that when he and Bennett left the scene, Duncan was still alive, lying on the ground and moaning.

Defendant first argues that he was denied his constitutional right to the effective assistance of counsel. Defendant sets forth nine reasons which, he argues, indicate that he was denied his constitutional right to the effective assistance of counsel. These reasons are based upon defense counsel's: (1) failure to object to a taped confession; (2) stipulation that the confession was given without improper inducement; (3) failure to suppress statements made in the absence of a knowing and intelligent *Miranda* waiver; (4) failure to object to an arrest allegedly made without probable cause; (5) failing to suppress an incriminating statement allegedly obtained by a police informer; (6) failure to use impeachment evidence to attack the credibility of a wit-

ness; (7) failure to tender Illinois Pattern Jury Instructions (IPI) accomplice instructions; (8) failure to seek self-defense and second degree murder instructions; and (9) failure to make other relevant objections throughout the trial. Ordinarily, the issues raised would not be reviewed because they were not properly preserved for appeal. However, phrased in terms of effectiveness of counsel, we deem it necessary to address each of them.

To succeed on a claim that counsel's assistance was so defective as to require reversal of a conviction, defendant must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; see also *People v. Chandler* (1989), 129 Ill. 2d 233, 242.) The purpose of the effective assistance guarantee of the sixth amendment is to ensure that criminal defendants receive a fair trial. *Strickland*, 466 U.S. at 683, 80 L. Ed. 2d at 690-91, 104 S. Ct. at 2062.

The *Strickland* test is a benchmark used to determine whether a defendant received a fair trial. Defendant must overcome a strong presumption of outcome reliability and show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2069.

Both prongs of the *Strickland* test must be proved by defendant. However, we need not determine whether counsel's performance was deficient before examining the prejudice allegedly suffered by defendant. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2068-69.

According to *Strickland*, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." (*Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) Such a prejudice inquiry does not seek to determine whether the outcome of the case would have been different absent the error. Instead, it is the "confidence in" and "reliab[ility of]" the outcome that is in question. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 697-98, 104 S. Ct. at 2068.) In making this inquiry, *Strickland* dictates that we must consider the "totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

Applying the standard set out in *Strickland* in the context of all the evidence before the trial court, we find that defendant was not

denied a fair trial due to the alleged errors of counsel. This finding rests on our determination that the findings at the trial level would not have been affected had trial counsel acted as defendant claims counsel should have.

▪ To begin with, defendant states that trial counsel was ineffective for failing to file a motion to suppress a taped confession. Defendant argues that the taped statement was obtained after he expressed a desire to discontinue interrogation in violation of his fifth amendment right to remain silent. We do not agree. Defendant correctly states the general rule that once an individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. (*Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28.) However, the demand to end the interview must be specific. (*People v. Aldridge* (1979), 68 Ill. App. 3d 181, 187.) The defendant in *Aldridge* used statements similar to those used by defendant in the present case during the confession. For example, the defendant in *Aldridge* stated, "I think you got enough," and, "Okay now have you got enough," and "there's nothing I want to add to it," and "you've got everything you need here now." (*Aldridge*, 68 Ill. App. 3d at 186-87.) The court in *Aldridge* found such language insufficient to trigger *Miranda*. In affirming this case, the Illinois Supreme Court stated that, "[r]ather than attempting to terminate the questioning altogether, defendant [was] merely resist[ing] answering questions concerning particular details of the offense to which he had confessed." *People v. Aldridge* (1980), 79 Ill. 2d 87, 95.

The defendant in *People v. Brown* (1988), 171 Ill. App. 3d 993, 995, also stated, "I already told you what happened." However, defendant's statement was made subsequent to an unambiguous "No" response to a question asking him to speak. Thus, the *Brown* court held that defendant's responsive "No" to the State's corresponding question was a clear invocation of defendant's right to remain silent which the State should have scrupulously honored.

In the present case, Blake informed defendant that he was looking into the death of Carrie Duncan. Defendant said that he and Kathy Bennett picked up Duncan a little after midnight in order to go to breakfast. Defendant stated that the last time he saw Duncan she was alive. At this time, Blake ended the conversation and advised defendant of his rights under *Miranda*. Defendant then proceeded orally to confess to the crime. After this statement, which lasted approximately 10 minutes, Blake asked defendant if he would consent to repeating his statement on a tape recorder. Defendant agreed. Blake

obtained a *Miranda* waiver form and asked defendant to follow along as it was read to him. Defendant signed the *Miranda* waiver form. The following statements were made when defendant was asked whether he understood his right to cut off questioning:

"Q. Okay, 'knowing and understanding these rights, I waive them at this time and agree to talk to the officers. Knowing and understanding also that if I desire to stop talking to the officers at any time, I am free to do so.' You put your initials there and you understand ...

A. Well, if I'm free to do so, then what happens? If I don't want to answer any more questions, then what happens?

Q. Okay, if you don't ... it's just what it says, right?

A. Uhm, uh (affirmative).

Q. Okay, it says that nobody can make you ... we're not here to browbeat you or anything else. If you want to stop and you decide, hey, I don't want to talk anymore, you don't have to, CALVIN.

A. You got all the stuff there right now. You don't need no more really.

Q. Well, but that's up to you. If you want to talk to us, okay. If you don't, okay. I want your words, not my words, okay. That's why I'm asking you if you will consent to putting this on tape, because I want what you tell me to come from you and not to come from me. Do you understand that? Okay, that's why we're asking you to do this, okay. And it says here, 'I make this waiver free, voluntary without any force, promises, or threats.' Now, we haven't made any promises or threats or used any force against you whatsoever, is that true?

A. True.

Q. And this is your signature. You signed it and you're willing to talk to us.

A. Uh-huh (affirmative).

Q. CALVIN, I'm going to ask you again to tell me in your own words what took place last night. But before I do that, the date today is November 2nd, correct?

A. Yup.

Q. And the time is 5:14 p.m.?

A. Uh-huh (affirmative).

Q. Okay. And I just want you to tell KEANE and I who you were with last night and what you did.

A. Okay.

Q. Okay.

A. I told you, though, once that ...

Q. Okay, well just go ahead and tell me again.

A. All right. Uptown in Paw Paw, drank beer at the tavern. Bowling alley."

In this manner, the detectives obtained a tape-recorded version of defendant's earlier oral confession.

While we recognize that language less strong than a "no" could be used to invoke a defendant's right to remain silent, defendant's language in this case did not rise to that level. As in *Aldridge,* defendant here failed to use language sufficiently strong to invoke his constitutional right to remain silent, and the police adequately informed defendant that he did not have to talk if he did not want to. Therefore, the failure of defendant's attorney to file a motion to suppress the taped confession did not prejudice defendant and render his trial unfair because such a motion would not have been successful.

■ Defendant next argues ineffective assistance where trial counsel stipulated that defendant gave a tape-recorded confession "voluntarily and without improper inducement." Defendant asserts that such a stipulation was inconsistent with the core of the defense. We do not agree.

We find nothing in the record which would indicate that defendant's confession was involuntary. The evidence indicates that defendant made his confession of his own volition and that the police neither promised anything in return nor threatened him to prevent noncompliance. In addition, defendant's testimony at trial indicates that he falsified his confession but does not indicate the presence of improper inducement. In light of these facts, we are not convinced that the defense counsel's stipulation to the voluntariness of defendant's confession had the effect of prejudicing defendant's case. As a matter of trial strategy, the defense counsel recognized that the statement would have been properly admitted without the stipulation. Therefore, he could have used the stipulation to minimize the harmful effect of the confession and, at the same time, enhance the credibility of aspects of the defense.

Defendant next contends that his trial counsel proved ineffective by failing to move to suppress statements based on the absence of a knowing and intelligent *Miranda* waiver. Defendant argues that the record affirmatively shows that he did not possess the requisite level of understanding required by an individual who is waiving his rights to remain silent under *Miranda.* Defendant cites *People v. Bernasco* (1990), 138 Ill. 2d 349, in stating the general rule that a *Miranda* waiver must be knowing and intelligent. Our review of the record

fails to support defendant's claim that his *Miranda* waiver was unknowingly or unintelligently made.

■ Defendant argues that testimony by a psychiatrist establishes that he has low mentality and low intelligence and is highly suggestible. However, one need not have a high IQ in order to waive *Miranda* rights. One need only understand basically what those rights encompass and minimally what their waiver will entail. *Bernasco*, 138 Ill. 2d at 363.

Defendant also argues that his confusion surrounding his decision to waive a preliminary hearing indicates his inability to understand what it means to waive a legal right. Defendant attempts to draw upon his confusion regarding this decision in order to support the generalization that he could not understand what it meant to waive his *Miranda* rights. In *Bernasco*, the court stated that "intelligent knowledge" does *not* mean "the ability to understand far-reaching legal and strategic effects of waiving one's rights." (*Bernasco*, 138 Ill. 2d at 363.) Thus, we determine that defendant's confusion with regard to the legal and strategic effects of waiving a preliminary hearing is unrelated to his decision to waive his *Miranda* rights. We are not convinced that defendant lacked the capacity to understand the *Miranda* waiver or Lieutenant Blake's explanation of its contents. Furthermore, we are not convinced that defendant lacked the intelligence to understand Blake when he said that, "[i]f you want to stop and you decide, hey, I don't want to talk anymore, you don't have to, CALVIN."

In *Bernasco*, the defendant was found not to have understood fundamental terms contained in the *Miranda* warnings, not to have been able to form an intent to weigh those rights, and not to have a normal ability to understand questions and concepts. In *Bernasco*, a school psychologist testified that the defendant probably would not have understood many of the terms contained in the *Miranda* waiver. No such direct evidence of defendant's inability to understand the *Miranda* waiver was presented in the present case. Furthermore, defendant was involved in financial transactions with a bank and with the victim in order to obtain funds to purchase vehicles for the purpose of fixing and selling them. Such abilities clearly surpass those of the defendant in *Bernasco*. Therefore, defense counsel's failure to move to suppress, based upon an ignorant or incompetent *Miranda* waiver, neither prejudiced defendant nor denied him a fair trial.

Defendant next argues that counsel's performance was ineffective because of counsel's failure to recognize an arrest without probable cause and counsel's failure to file a motion to quash the arrest and

suppress defendant's subsequent statements. The fourth and fourteenth amendments to the United States Constitution dictate that an individual cannot be seized or arrested without probable cause. *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.

An arrest occurs when the police inform defendant of a violation, defendant submits to their control, and it is clear that the police intend to arrest defendant and that defendant understands he is being arrested. (*People v. Avery* (1989), 180 Ill. App. 3d 146, 152.) The test for whether a person has been seized is "whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (*Avery*, 180 Ill. App. 3d at 153.) According to *Avery*, the "coercive effect of police conduct taken as a whole" must be examined and not "each particular detail of the police conduct in isolation." (*Avery*, 180 Ill. App. 3d at 153.) In *Avery*, the appellate court held that the trial court erred in finding that no arrest occurred when defendants were first taken into custody for questioning. The court pointed to several factors which tended to indicate that an arrest had taken place. For example, the police located defendants at or near their homes and brought them to the station for interrogation about their involvement in the murder, defendants were not told they were free to leave, defendants could reasonably believe that they could not leave, defendants were kept in interrogation rooms for 8 and 10 hours, and defendants were left alone for hours at a time.

■ In the present case, four officers went to defendant's home; two officers identified themselves as law enforcement officials. Defendant was informed that the officers wanted to talk to him about Duncan's death. Defendant was asked if he would be willing to accompany the officers to the fire station in order to answer questions about Duncan's death. Defendant, accompanied by his girlfriend and her son, drove himself to the station. Defendant switched cars at the fire station and was accompanied by two officers to go to the village hall for the interview. Defendant gave an oral confession within the first few minutes of the interview, and defendant gave a taped confession approximately 15 minutes later.

Thus, defendant was not interviewed for a lengthy period of time as was the defendant in *People v. Townes* (1982), 91 Ill. 2d 32. Further, defendant was asked if he would be willing to accompany the officers and was thus given the impression that he could leave. (See *People v. Cooney* (1985), 136 Ill. App. 3d 989.) Defendant points out that the defendants in *Cooney* were asked if they wanted to return

home. Defendant argues that no similar confirmation of freedom was conveyed here. However, we view defendant's option to drive in the present case as being equally indicative of the absence of coercion.

Finally, defendant was never handcuffed and was not a suspect until later in the interview. (*People v. Collins* (1989), 182 Ill. App. 3d 362.) We find that these facts, taken as a whole, do not indicate sufficiently coercive conduct on the part of the police to cause a reasonable man to believe that he could not leave. Therefore, we conclude that defendant was never seized or arrested during the time period leading up to his confession. Because defendant's counsel would have been unsuccessful in attempting to quash defendant's arrest and suppress defendant's subsequent statements, neither was defendant prejudiced nor was his trial unfair.

Defendant next argues that trial counsel was ineffective for failing to file a motion to suppress an incriminating statement obtained by a police informant in violation of defendant's sixth amendment right to counsel. The United States Supreme Court has held that the "Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State." (*Maine v. Moulton* (1985), 474 U.S. 159, 176, 88 L. Ed. 2d 481, 496, 106 S. Ct. 477, 487.) In *Moulton*, the Supreme Court held that the sixth amendment is *not* violated "whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." (*Moulton*, 474 U.S. at 176, 88 L. Ed. 2d at 496, 106 S. Ct. at 487.) However, the State is forbidden from knowingly exploiting an opportunity to confront the accused without counsel being present. *Moulton*, 474 U.S. at 176, 88 L. Ed. 2d at 496, 106 S. Ct. at 487.

In the present case, defendant telephoned a friend (Schmidt) from prison. Defendant related that he and Bennett played equal roles in the killing. A detective who was interested in learning more about defendant's motive asked Schmidt whether defendant had mentioned a car title during this conversation. Evidence of defendant's possession of the car title would tend to show that defendant killed Duncan in order to obtain the title and, thus, avoid paying off a debt defendant owed to Duncan, who purchased the car for defendant. Schmidt answered that defendant did not mention a car title. Upon receiving a subsequent phone call from defendant, Schmidt proceeded to ask about the title. After this call, Schmidt conveyed the information he obtained to the police. There is no evidence to indicate that the police told Schmidt to ask defendant about this matter. We find that there is insufficient evidence in the record to suggest that the State know-

ingly exploited an opportunity to confront the accused without counsel. Furthermore, even if we did assume that the evidence obtained was improper, its admission would be harmless because other evidence was introduced to establish that defendant was indebted to Duncan. For example, defendant himself testified that he was indebted to Duncan for well over $2,500.

Defendant next argues that trial counsel was ineffective for failing to use available impeachment evidence to attack the credibility of Bennett and for failing to tender IPI instruction No. 3.17 (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981) (hereinafter IPI Criminal 2d)).

■■ Defendant's girlfriend, Bennett, was called to testify against defendant during his trial. At this time, Bennett had already been convicted of the murder of Duncan in a previous trial. She was sentenced to 55 years' imprisonment, and her case was on appeal. On direct examination, Bennett was impeached when she admitted that she had already been convicted of and sentenced for the murder of Duncan. Such an admission was consistent with defendant's testimony at trial that Bennett was the sole actor.

Defendant now claims that defense counsel should have tendered IPI Criminal 2d No. 3.17. The instruction reads:

"When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." (IPI Criminal 2d No. 3.17.)

We do not believe that submission of IPI Criminal 2d No. 3.17 is essential when applied to the present set of facts.

The purpose of the instruction is to warn the jury that there may be a strong motivation for a witness to provide false testimony for the State in return for immunity or some form of lenient treatment by the State. (*People v. Carreon* (1987), 162 Ill. App. 3d 990, 993.) In the present case, Bennett had already been convicted of and sentenced for the murder of Duncan. Therefore, her expectation of leniency or favoritism on the State's behalf was virtually nonexistent. As a result, the rationale underlying the application of the instruction is not present, and trial counsel's failure to tender such an instruction cannot be deemed ineffective. The claim that defense counsel was deficient relative to any further impeachment of Bennett than that actually presented lacks merit.

Defendant next argues that trial counsel was ineffective for failing to introduce evidence or tender jury instructions on the theories

of self-defense and second degree murder. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—2(a)(2), 7—1.) We find trial counsel's actions in this regard neither prejudiced defendant nor denied him a fair trial.

■■ As previously stated, Duncan was severely beaten and stabbed repeatedly. She was under 5 feet tall, weighed approximately 100 pounds, and was over 80 years old and was unarmed, whereas defendant stood over 6 feet tall and weighed well over 200 pounds. Defendant stated that he thought Duncan had a gun in her purse. However, the amount of force used against her was clearly disproportionate to the amount necessary to take her purse and "disarm" her. Given these facts, there is insufficient evidence to submit the issue to the jury.

■■ Defendant also argues that defense counsel should have tendered second degree murder instructions based on evidence that the killing was provoked by "conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(b).) Defendant cites *People v. Austin* (1989), 133 Ill. 2d 118, for the proposition that "mutual combat" can give rise to "intense passion" which will justify a second degree murder instruction. Defendant uses the definition of "mutual combat" supplied by *Austin* and attempts to characterize the facts in the present case as a struggle entered willingly by both parties or a mutual fight upon equal terms. (*Austin*, 133 Ill. 2d at 125.) In the instant case, we find that the facts defy such an interpretation.

The evidence which defendant relies upon to establish the existence of "intense passion" must "rise above the level of a mere factual reference or witness' comment, for otherwise defendant could force the trial court to include unlimited instructions which are not related to the case." (*Austin*, 133 Ill. 2d at 125.) Here, the only evidence of provocation in the record is that Duncan was arguing with defendant and that defendant thought Duncan had a gun in her purse. In *Austin*, the defendant shot and killed an unarmed bus driver in the course of a fist fight where the driver provoked defendant by speaking gruffly to her and striking her on the hand with a transfer punch. Our supreme court found that shooting the driver was an act completely out of proportion to the provocation and that mutual combat cannot apply where the bus driver did not enter the struggle willingly and where the fight was not on equal terms. *Austin*, 133 Ill. 2d at 125-27.

Likewise, we find that the mutual combat aspect of provocation would be wholly inappropriate here. (*People v. Ford* (1987), 163 Ill. App. 3d 497, 503.) Where the perceived danger to defendant could have been removed by discarding the victim's purse (which did not

contain a gun), and where the evidence shows that the 80-year-old victim was stabbed 11 times and kicked with sufficient force to cause death, a claim of mutual combat cannot apply. Therefore, defendant suffered no prejudice as a result of trial counsel's failure to seek second degree murder instructions.

██ Defendant next argues that he received ineffective assistance of counsel based upon defense counsel's failure to make several objections. Specifically, defense counsel failed to: (1) make a hearsay objection with respect to testimony given as to the extent of defendant's indebtedness to the victim; (2) make a relevancy objection with respect to testimony to the effect that had Duncan received immediate medical care, she would have survived; (3) object to improper *voir dire* questioning by the prosecutor; (4) object to the trial court's decision to bar evidence indicating that Bennett regularly carried a small knife; and (5) object to improper statements made by the prosecutor at closing and to improper peremptory challenges made by the prosecutor during the early stages of trial. At this point, we reiterate the *Strickland* test, which requires a defendant to prove that counsel's unprofessional errors effectively undermined confidence in the outcome. Furthermore, the test places the burden on defendant to show that, absent counsel's errors, "the factfinder [sic] would have had a reasonable doubt respecting guilt." (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) In light of the totality of the circumstances, we find that successful objections to the items above would not have given rise to a reasonable doubt of defendant's guilt.

First, defendant disputes the extent of his indebtedness to the victim at the time of her death. Defendant claims he owed about $2,500 on a car purchased by Duncan for defendant's use. Defendant also claims that trial counsel admitted hearsay evidence which inflated the amount of money defendant owed to Duncan to somewhere between $4,000 and $8,000. Defendant argues that this hearsay evidence of the inflated debt made his motive to kill her seem greater. We find nothing on the record indicating that the testimony as to defendant's indebtedness was indeed hearsay. Further, we do not see the difference in values as being so great that it unduly distorts defendant's motive to kill.

Second, we recognize the limited relevancy of the testimony to the effect that Duncan may have survived had she received immediate medical attention. However, we fail to see how defendant would benefit had the jury been left with the impression that Duncan's death was immediate.

Third, the central focus of defendant's argument about prosecutor behavior during *voir dire* is on questions which sought to determine whether potential jurors understood that the proof beyond a reasonable doubt standard was the same in criminal cases as in traffic violations. In this respect, we note that "[w]here violation of the Motor Vehicle Act is charged, the burden of proof required to sustain a conviction is the same as in any other criminal case." (*People v. Mindock* (1970), 128 Ill. App. 2d 196, 199.) Although the prosecutor's statements were, to some extent, improper, they do not work to trivialize the applicable burden of proof. Therefore, trial counsel's failure to object to these questions was harmless error at most.

Fourth, we find meritless defendant's claim that the prejudice resulted from the defense counsel's failure to object to the prosecutor's questions asking the jury if it can distinguish between right and wrong and to the prosecutor's use of peremptory challenges. There is no evidence that the jury corrupted the laws of the State of Illinois with its own moral compunctions, and there is no claim that the prosecution violated the rule in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, by making a race-based peremptory challenge.

Fifth, defendant argues that defense counsel should have objected when the trial court barred evidence that Bennett always carried a knife and holster at her waist and that she once threatened defendant with a knife similar to the one allegedly used to kill Duncan. We note the record shows that, when threatened by Bennett with a knife in the past, defendant successfully disarmed her and bent the knife. Therefore, we fail to see how defendant was prejudiced by the absence of this evidence at the trial. Admittedly, the evidence might show Bennett's ability to commit the crime. However, such evidence also shows both that defendant was not intimidated by an armed individual in general and was not intimidated by Bennett in particular. Such evidence would undercut the defense theory that defendant was influenced and intimidated by Bennett. In addition, evidence of the knife was not relevant because it was not claimed to be the murder weapon. Therefore, we refuse to find that the admission of this evidence would have given rise to a reasonable doubt on the part of the fact finder.

Finally, we reject defendant's argument that the prosecutor improperly aligned himself with the jury by implying he was the thirteenth juror. To support this position, defendant correctly cites *People v. Vasquez* (1972), 8 Ill. App. 3d 679. (See also *People v. Enoch* (1989), 189 Ill. App. 3d 535, 552.) According to *Vasquez*, "the evil of the

[thirteenth juror] argument is that in effect it tells the jury that the prosecutor is impartial, while such an argument flies in the face of our adversary system." (*Vasquez*, 8 Ill. App. 3d at 681.) In *Vasquez*, the prosecuting attorney unambiguously identified himself as the thirteenth juror in the case. No such blatant impropriety existed here.

During his closing argument the prosecutor stated that "it would be nice if we could sit down around a big table and I could talk and answer questions." But, the prosecutor then qualified his statement by saying, "[u]nfortunately our system does not allow us that opportunity." The prosecutor also expressed the hope that the jury would think about how the prosecutor would have answered certain questions. While improper to some degree, these statements do not rise to the improper level of juror alignment warned about in *Vasquez*. Since the prosecutor's actions did not prejudice defendant, defense counsel's failure to object should not result in a finding that defense counsel was ineffective.

Defendant next argues that defense counsel was ineffective for failing to object to a statement made during the prosecutor's closing argument that highlighted the absence of evidence which the prosecutor himself sought to keep out. The evidence sought to be excluded amounted to a statement by a psychiatrist regarding defendant's mental condition. The prosecutor correctly sought to prevent the admission of such testimony on the ground of relevancy because there was no offer of defense of insanity or defense of guilty but mentally ill. At closing, the prosecutor apparently attempted to attack the implication of insanity on the part of defense. The prosecutor accomplished this by pointing out the absence of testimony that defendant could not control himself. We find these statements harmless because the defense of insanity was never raised. The prosecution is pointing out that insanity was not established. We see no prejudice resulting from these comments. The general rule is that the prosecutor must confine himself "to facts introduced in evidence and to the fair and reasonable deductions and conclusions to be drawn therefrom." (*Vasquez*, 8 Ill. App. 3d at 681.) Here, a reasonable deduction to be drawn from the defense presented was that an attempt was being made to excuse defendant from responsibility for the crime because he was easily influenced. The prosecution could fairly assume that this line of argument amounted to an implicit attempt to prove insanity. Given these circumstances we do not perceive that defendant was prejudiced. It is important to note there were no misstatements of facts or proof in the prosecutor's closing statement.

In conclusion, defendant argues that he was denied effective counsel as a result of defense counsel's failure to object to (1) the prosecutor's statement during closing arguments that, "you [the jury] promised me that you would enforce the laws of the state of Illinois"; and (2) the prosecutor's use of the properly admitted taped confession during closing arguments.

Defendant cites *People v. Thomas* (1986), 146 Ill. App. 3d 1087, for the proposition that the prosecutor must not present an argument that diminishes the presumption of innocence. In *Thomas*, the court remanded defendant's case for a new trial where the prosecutor, during his closing argument, asserted that the central witness lied because she was afraid of the defendant. The prosecutor then told the jury that "[t]here's nobody here for the People, just you." (*Thomas*, 146 Ill. App. 3d at 1089.) The prosecutor's statement in the present case is distinguishable. The prosecutor here was simply imploring the jury to enforce the laws of the State of Illinois. Such a comment does not improperly diminish the presumption of innocence. Instead, it is an attempt to urge the fearless administration of the law. According to *Thomas*, this is proper conduct during closing. *Thomas*, 146 Ill. App. 3d at 1089.

Defendant's argument with respect to the prosecutor's use of the taped confession during closing is equally unpersuasive. A primary purpose of the closing argument is to review the evidence for the jury. (*People v. Davies* (1977), 50 Ill. App. 3d 506, 514.) The use of properly admitted evidence during closing is permissible. (*People v. Eckles* (1980), 83 Ill. App. 3d 292.) The properly admitted tape recording at issue here does not unduly emphasize certain facts, but, rather, was presented in the context of a relation of the events surrounding the crime, the evidence of the crime, and the relevant prosecutorial theories regarding the crime. Because the presentation of the tape recording was relatively brief, we do not view its admission as prejudicial. In addition, by its very nature, the tape recording was an accurate repetition of the evidence. In *Davies*, concerns of accuracy and brevity were addressed in finding an absence of prejudice where trial transcript excerpts were read during closing argument. (*Davies*, 50 Ill. App. 3d at 514.) In light of the totality of the circumstances, we find that the prosecutorial conduct described above did not affect the fairness of defendant's trial. Therefore, defendant was not prejudiced by counsel's failure to object to that conduct.

Defendant's final argument is that he must be granted a new sentencing hearing because the trial court relied on the death of the victim as an aggravating factor at the sentencing hearing. Even

though trial counsel failed to preserve this issue, we may review a court's reliance on an improper factor in aggravation in sentencing because it affects the defendant's fundamental right to liberty and, thus, amounts to plain error. *People v. Martin* (1988), 119 Ill. 2d 453, 458.

The general rule is that a factor necessarily implicit in a crime should not be used as an aggravating factor when sentencing for that crime. *People v. Conover* (1981), 84 Ill. 2d 400, 404.

According to the policy underlying this rule, it is reasonable to conclude that the legislature already considered the death of the victim as a factor when establishing the penalties for murder. Therefore, the trial court should not consider the death of the victim as a factor which aggravates the statutorily prescribed penalty for murder. To do so would be to subject defendant to a harsher penalty than that envisioned by the legislature. *People v. White* (1986), 114 Ill. 2d 61, 66.

At the sentencing phase of the present trial, the trial judge stated that "[t]he factors that apply here [in aggravation] are one, the defendant's conduct caused serious harm. Here the defendant's conduct caused the most serious harm, death." The judge then pointed out that the offense was committed against a person 60 years of age or older, and that deterrence was also an element in sentencing. The judge stated that "[t]hese are all serious aggravating factors." The judge also highlighted the brutality of the crime, the character of the defendant, the nature and circumstances of the offense, the public interest in the punishment of the guilty, and the public interest in the protection of the innocent. Following the rule in *Conover*, the trial court should not have considered the death of the victim as a factor in aggravation when sentencing the defendant for murder. In addition, the judge should not have considered the age of the victim when sentencing defendant for a conviction on an aggravated battery count which is premised upon a battery committed against a person 60 years of age or older.

Having determined that the trial court considered an improper aggravating factor in imposing the sentence, we must now determine if remand for resentencing is required. In *People v. Bourke* (1983), 96 Ill. 2d 327, our supreme court held that, "[w]here the reviewing court is unable to determine the weight given to an improperly considered factor, the cause *must* be remanded for resentencing. [Citations.] However, where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required." (Emphasis added.) *Bourke*, 96 Ill. 2d at 332.

Because the trial court in the present case stated that the death of the victim was a "serious aggravating" factor, we cannot say that its reliance on this factor was so insignificant that it did not lead to a greater sentence.

One of the elements courts consider in determining the significance given to an improperly considered aggravating factor is the trial court's own statements regarding the weight given to each of the factors. In *People v. White* (1986), 114 Ill. 2d 61, the judge improperly considered that the victim was a child under the age of 13 years when a necessary element of a conviction of aggravated battery of a child is that the victim is less than 13 years of age. In *White*, our supreme court found that reliance upon this aggravating factor was insignificant when considered in light of the fact that the trial judge recited three other factors which he found to be aggravating. More importantly, the judge placed primary importance on the need to deter crimes of a similar nature from occurring in the future.

The other side of this coin was illustrated in *People v. Saldivar* (1986), 113 Ill. 2d 256, 272. In *Saldivar*, the defendant was resentenced because the trial court inappropriately pointed to the death of the victim as the "number one" factor in aggravation.

In the present case, the trial judge did not point to the death of the victim as the number one aggravating factor. However, the judge did consider the death of the victim to be a "serious" aggravating factor. Therefore, we will follow the reasoning in *Bourke* and remand because we cannot determine how much weight the improper factor was accorded. *Bourke*, 96 Ill. 2d at 332.

Another element which courts examine in determining the significance placed upon an improperly considered aggravating factor is the actual length of the sentence imposed. Where the sentence is substantially below the maximum sentence permissible, the court is less likely to remand for resentencing. However, where the penalty imposed is near the maximum, the court is more likely to find that reliance was placed upon the improper aggravating factor. See *Bourke*, 96 Ill. 2d 327; see also *White*, 114 Ill. 2d 61; *Martin*, 119 Ill. 2d 453.

In the present case the defendant received a substantial penalty of 60 years. Therefore, we cannot say that the trial court's reliance on this "serious aggravating" factor was insignificant. Since we are unable to determine the weight given to these improperly considered factors, the case must be remanded to the trial court for resentencing. However, for the reasons previously stated, the judgment of the circuit court of Lee County concerning defendant's conviction is affirmed.

 We next address an issue that the parties failed to raise. As previously noted, defendant was convicted of five counts of first degree murder. However, only one murder was committed. The general rule is that when there is one person murdered, there can only be one conviction. (*People v. Mack* (1984), 105 Ill. 2d 103, 136-37.) Convictions of more than one offense cannot be carved from the same physical act. (*People v. Szabo* (1983), 94 Ill. 2d 327, 350.) We consider this issue even in the absence of proper preservation because an error in sentencing can affect defendant's fundamental right to liberty and thus amount to plain error. *People v. Martin* (1988), 119 Ill. 2d 453, 458.

When multiple convictions are had for offenses arising out of a single act, the sentence is imposed on the most serious offense. (*Mack*, 105 Ill. 2d at 137.) Courts have used the length of penalties imposed (*People v. Duszkewycz* (1963), 27 Ill. 2d 257, 261) and the degree of mental culpability (*Mack*, 105 Ill. 2d at 137) in order to determine which offense is more serious. In *Mack*, the court explained that the mental culpability test is more useful in making the determination as to which of several murder charges is most serious where the penalty for each of the charges would be the same. *Mack*, 105 Ill. 2d at 137.

In the present case, we are unable to use the penalty provided in making our determination as to which conviction should stand, because all five murder charges involve identical penalties. Neither can we examine culpable mental states because all of defendant's murder charges involve a knowing infliction of harm. Three of the counts involve an act which the defendant knows will create a strong probability of death or great bodily harm. The two other felony murder counts are predicated upon the commission of an aggravated battery in which the defendant knows that his acts will cause "great bodily harm" or "bodily harm to an individual of 60 years of age or older." In our view, the section 9—1(a)(2) counts involving acts which create a strong probability of death are more serious than a situation where the defendant causes bodily harm or great bodily harm. Thus, we vacate the murder charges based on section 9—1(a)(3). Among the section 9—1(a)(2) counts are charges that defendant knowingly created a strong probability of death by (1) kicking Duncan in the head; (2) stabbing Duncan; and (3) kicking Duncan in the head and stabbing Duncan. We hold that the most serious among these section 9—1(a)(2) charges is the conviction of defendant based on acts which "knowingly created a strong possibility of death or great bodily harm by kicking Duncan in the head and stabbing Duncan" because it involves

the greatest degree of damage. Therefore, we affirm the conviction and sentence for this count. The other convictions and sentences are vacated. See *Mack*, 105 Ill. 2d at 137 (where the single act/single crime rule was violated, both the offending conviction and sentence are vacated).

The judgment of the circuit court of Lee County is affirmed in part and vacated in part, and the cause is remanded to the circuit court for resentencing.

Affirmed in part; vacated in part and remanded.

DUNN and NICKELS, JJ., concur.