# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Appelt, 2013 IL App (4th) 120394**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GEORGE A. APPELT, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0394 |
| Filed | October 4, 2013 |
| Rehearing denied | November 1, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the aggravated battery of his roommate was upheld over his arguments that the evidence was insufficient to sustain his conviction and that a police officer's negative response to the prosecutor's question as to whether defendant made a statement that he was innocent and suggested that the victim was battered by someone else shifted the burden of proof to defendant, since a rational trier of fact could have found defendant guilty beyond a reasonable doubt and the prosecutor's question did not imply that defendant had any obligation to present evidence in the trial. |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 11-CF-1303; the Hon. Timothy J. Steadman, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, of State Appellate Defender's Office, of Springfield, and Alan D. Goldberg and Manuel S. Serritos, both of State Appellate Defender's Office, of Chicago, for appellant.

Jay Scott, State's Attorney, of Decatur (Patrick Delfino, Robert J. Biderman, and Luke McNeill, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion.

Presiding Justice Steigmann and Justice Turner concurred in the judgment and opinion.

## OPINION

¶ 1      A jury found defendant, George A. Appelt, guilty of aggravated battery (720 ILCS 5/12-3.05(d)(2) (West 2010) (added by Pub. Act 96-1551, art. 1, § 5 (eff. July 1, 2011))), and the trial court sentenced him to imprisonment for four years.

¶ 2      Defendant appeals for two reasons. First, he argues the evidence is insufficient to support his conviction. More specifically, he argues the State failed to prove he was the person who committed the aggravated battery of Teresa Jackson. He does not dispute that Jackson suffered an aggravated battery; he merely disputes that he was the one who battered her. Looking at the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that defendant was the person who committed the aggravated battery.

¶ 3      Second, defendant argues the trial court abused its discretion by overruling his objection, and by denying his motion for a mistrial, on the ground that a question the prosecutor asked a police officer during direct examination shifted the burden of proof to the defense. The prosecutor asked the police officer whether, in a statement that defendant made in the squad car, he declared his own innocence and suggested that someone else had battered Jackson. (The police officer answered no.) Because this question did not imply that defendant had any obligation to present evidence in the trial itself, the question did not shift the burden of proof to the defense, and the court did not abuse its discretion by overruling the objection and denying the motion for a mistrial.

¶ 4      So, disagreeing with both of the arguments that defendant makes in this appeal, we affirm the trial court's judgment.

## I. BACKGROUND

In the jury trial, which occurred in January 2012, the State called three witnesses: Teresa Jackson, Sharon Parker, and Brian Allison. The defense called one witness: Richard Lohse. We summarize their testimony below.

### A. Teresa Jackson

#### 1. *Direct Examination by the Prosecutor*

Teresa Jackson testified through a sign language interpreter. She was 43 years old and had been deaf since the age of 10. She could hear if she wore a hearing aid, but she was not wearing one when she testified.

She had been dating defendant for approximately 10 1/2 years. She had lived with him off and on. On the day he was arrested, September 10, 2011, she was living with him in his residence, at 2473 East North Street, Decatur. At the time of trial, she lived elsewhere.

The morning of September 10, 2011, Jackson and defendant were together in his residence. The prosecutor asked Jackson:

"Q. And at some point in the morning, did a fight begin between the two of you?

A. No. Really, somehow there was no power."

In other words, defendant's residence had no electricity the morning of September 10, 2011, and Jackson claimed it was too dark to see.

Between 5 and 6 a.m. (but she was unsure of the time, given that she had no watch and the electric clock was not working), she awakened when someone began beating her. In the darkness, she could not see who the assailant was. She had no idea whether it was a man or a woman who was pummeling her in the face and on the back.

The prosecutor asked Jackson:

"Q. Did George hit you at all that morning?

A. I don't know. I don't know who did it. I don't know if it was George or somebody else.

Q. So it could have been George hitting you?

A. I'm not sure. How am I going to know? I can't see."

(She meant she could not see with the electricity turned off. It does not appear from the record that she had any visual impairment.)

Around 11 a.m. or noon, after being beaten up, Jackson telephoned a next-door neighbor, Sharon Parker, and went over to her house. The prosecutor asked Jackson:

"Q. And why did it take you so long between when you originally were beat up until when you got to her house to have her call the police for you?

A. Well, really because I was wanting to know who did it, who did that to me.

Q. Did Sharon then call the police for you after you wrote to her what had happened?

A. Yes."

Parker retained Jackson's handwritten note (according to Jackson).

¶ 15    Jackson testified that upon leaving Parker's house, she returned to defendant's residence, 2473 East North Street, "to check to make sure where [her] things were and make sure [her] things were okay."

¶ 16    A police officer eventually found Jackson and spoke with her. The prosecutor asked Jackson:

"Q. Do you recall a police officer writing questions to you and you writing answers?

A. Yes.

* * *

Q. *** So you were asked–and I'm just asking for a yes-or-no answer–'What has happened today?'

A. Yes.

Q. Did you answer, 'He be[a]t me up. No reason'?

A. Yes.

* * *

Q. Did you answer–when he asked you with an object, did you answer, 'Fists'?

A. Yes.

Q. Were you asked, 'How many times did he hit you?'

A. Yes.

Q. Did you answer, 'Many'?

A. Yes.

Q. Were you asked, 'When did this happen?'

A. Yes.

Q. Did you answer, 'Today'?

A. Yes.

Q. Were you asked, 'What time?'

A. Yes.

Q. Did you answer: '5:00 a.m. and 10:00 a.m.'?

A. Yes.

Q. Were you asked, 'What is his full name and date of birth?'

A. Yes.

Q. Did you answer, 'George Alan Appelt. 11-02-1964'?

A. Yes.

Q. Were you asked, 'Did he cause the bruises to your face and injury to your hand?'

A. Yes.

Q. And did you answer, although not on paper, 'Yes'?

A. Yes."

¶ 17    The prosecutor then showed Jackson some photographs, People's exhibits Nos. 1 through

4, which Jackson identified as photographs of the injuries she had sustained from the beatings. The photographs showed her with a black eye, from being struck in the face with a fist; a bleeding cut on the index finger of her left hand, from "trying to hold the person that was attacking [her]"; and a bruise and scratch on her back, from being held down.

¶ 18                            2. *Cross-Examination by Defense Counsel*

¶ 19      On cross-examination, Jackson testified (in apparent contradiction with the preceding direct examination) that defendant did not stay at his residence, 2473 East North Street, the night of September 9, 2011, and that she did not see him at all on September 10, 2011, the day he was arrested.

¶ 20      She confirmed, on cross-examination, that "somebody came back twice" to beat her the morning of September 10, 2011, and that after 10 a.m., she went to Parker's house (although she could not be certain of the time, given that she "didn't have any power").

¶ 21      Defense counsel asked Jackson:

"Q. Did you go to [Powers's house] right away, or did you wait a while?

A. I waited a little bit, for a few minutes because I was very nervous and scared.

Q. You said something in your testimony earlier today about having called Sharon first. Did you call her on the phone first?

A. Yes.

Q. Did you have a phone that worked?

A. I have no phone. I don't have a phone.

Q. Then how is it that you called Sharon before you went to her house?

A. I walked over to Sharon's house.

Q. All right. So you didn't call Sharon first?

A. No. I walked over to her house."

¶ 22      Defense counsel then asked Jackson whom she meant when she wrote, in her note to the police officer: " 'He beat me up. No reason' ":

"Q. Who's 'he'? 'He beat me up.' Who are you referring to?

A. I wrote it–really I had no idea."

¶ 23      Defense counsel asked why she wrote defendant's name in her note to the police officer. She answered:

"A. Well, I was in a hurry.

Q. Were you writing that to say that George was the one who beat you up for no reason?

A. Yes.

Q. Why were saying it was George that beat you up for no reason?

A. Well, I remember–it was a long time ago, and that's what happened, and I was reminded of that.

Q. What do you mean it was a long–what was a long time ago? The September incident or some other thing?

A. No. Another time. A long time ago."

¶ 24 She did not remember which answer she gave the police officer, yes or no, in response to the question " 'Did he cause the bruises to your face and injury to your hand?' " Defense counsel asked her:

"Q. Do you recall if–at the time the officer wrote, 'Did he cause the bruises to your face and injury to your hand,' did you believe that he was talking about George? Is that who you were answering about?

A. No.

Q. Now, is someone forcing you in any way to say that it was not George Appelt that struck you?

A. No. No one. No one is saying anything.

Q. In fact–

A. Not–no one said a word to me."

¶ 25 Defense counsel then showed Jackson a document, defendant's exhibit No. 1, which she identified as a note she wrote to defense counsel and the prosecutor on November 14, 2011. In this note, she claimed the police officer did not understand what she told him on September 10, 2011, because no sign language interpreter was present during the interview.

¶ 26 Defense counsel next showed her defense exhibit No. 2, which she identified as a note she wrote "[p]robably before Christmas." Defense counsel asked her:

"Q. Now, in this letter you indicate, 'I was not sure who did [it] to me.' Is that–by that, do you mean you're not sure who–

A. I'm not sure what person came in because I couldn't see. I had no power. So how am I supposed to know who the person is that came in?

Q. And then in the third paragraph you go on to say something similar to what you wrote in the first one about 'Well, I don't understand what the people say.'

A. That's right."

¶ 27 Finally, defense counsel showed Jackson defendant's exhibit No. 3, which she identified as a note she wrote "[j]ust a few weeks ago." Defense counsel asked her:

"Q. And in this statement you also wrote 'Someone was [*sic*] broke in the door. Then I feel bumping, and I couldn't see who was there.' Is that right?

A. Yes.

Q. And then you also say in the next–start of the next paragraph 'George didn't do it.' What did you mean by that?

A. Yes. He did not hit me. I don't know whether he did or not, so that means he didn't do it."

### 3. *Redirect Examination by the Prosecutor*

On redirect examination, Jackson testified that 2473 East North Street was a two-story apartment building, that defendant's apartment was on the second floor, and that his apartment had windows. The prosecutor then asked her:

"Q. Now, was it dark out that day for some reason at 10:00 a.m. or was it light out?

A. Well, really it was light, but I had a blanket covering my head so I couldn't see. It was a thick blanket. I didn't use blinds. I used a thick blanket to cover myself.

Q. And you didn't try to remove that blanket to see who was beating you up?

A. No. The blanket was–oh, I'm sorry. The blanket was over the window.

Q. Okay. So you are testifying that you still weren't able to see anything at 10:00 a.m.?

A. That's correct."

The prosecutor then questioned Jackson about defendant's exhibit No. 3. She asked Jackson:

"Q. And in that letter is it correct that you say, 'He was work[ing] with someone. He got home around noon. Well, Rick told me that he went [to] work.'

A. Yes."

Rick, she testified, was defendant's friend. She thought Rick's last name was Loshe.

The prosecutor asked Jackson:

"Q. Are you saying you know the defendant was working with Rick at the time you were beaten up?

A. No. No.

Q. So you don't know when the defendant was working?

A. No. I don't know.

Q. Rick has just told you to tell us that defendant was working?

A. Yes.

Q. Did Rick say anything else to you?

A. No. He just said that–he told me that George was working. That's all he said.

Q. Now, you've said to Mr. Reuter [(defense counsel)] that you didn't understand exactly–you're now saying you didn't understand exactly what the police officer was saying to you because there wasn't an interpreter; correct?

A. That's right.

Q. But you know how to read and write; correct?

A. Yes. I know how to read, yes, and write, but sometimes big words I don't understand.

Q. But none of the words that the officer wrote to you were big words that you didn't understand, were they?

A. No."

¶ 33                                      B. Sharon Parker

¶ 34      Before the State called Sharon Parker to the stand, the trial court heard arguments about an anticipated hearsay objection. It was expected that, in her testimony, Parker would recount what Jackson told her in a handwritten note on September 10, 2011. After hearing arguments, the court ruled that the hearsay would be admissible under the exception for excited utterances. See Ill. R. Evid. 803(2) (eff. Jan. 1, 2011).

¶ 35      Parker testified she was 63 years old and that on September 10, 2011, she resided at 2438 William Street in Decatur.

¶ 36      She had been acquainted with Jackson and defendant for about 1 1/2 years. She had seen them together in the neighborhood, and she was aware they lived together. She had helped Jackson now and then by running errands for her and by making telephone calls to defendant at Jackson's request.

¶ 37      In the late morning or early afternoon of September 10, 2011, Jackson came to Parker's house. The prosecutor asked Parker:

          "Q. What was her demeanor when she arrived?

          A. She was very upset. She was bleeding. She was black and blue. She asked me to get a paper, and she wrote down what she wanted me to do with it.

          Q. Was she crying?

          A. Yes.

          Q. And what did she write to you?

          A. She wanted me to call the police. She said George had beat her up and that she was going over to her other friend's house, and she gave me the address on that piece of paper.

          Q. Did you keep that piece of paper that she wrote on?

          A. No. I gave it back to her because I thought she'd give it to the policeman."

¶ 38      In response to the note from Jackson, Parker went into her own house and telephoned the police and then came back out and handed the note back to Jackson, whereupon Jackson left.

¶ 39      On cross-examination, Parker testified she believed it actually was in the afternoon when Jackson came to her house. She did not recall the time. Jackson stayed for only three or four minutes before heading to the friend's house, or at least that was where the note said she was going.

¶ 40      Parker knew only what Jackson had written in the note, nothing more. Defense counsel asked Parker:

          "Q. Did you ask her about what she meant exactly?

          A. Yes.

          Q. Did she tell you what she meant?

          A. She wrote that George had beat her up again. ***

          Q. Do you recall exactly the wording of what was written between the two of you?

A. It said, Please call the police. George beat me up again. I'm going to my friend's who lives on such and such an address. I believe it was Prairie Street, and she said, Thank you.

Q. Okay. And that's all?

A. That's all."

¶ 41                              C. Brian Allison

¶ 42    Brian Allison testified that on September 10, 2011, at 2:42 p.m., he was working as a Decatur police officer when he was dispatched to 2404 East Prairie Street to investigate a domestic disturbance. At that address, he met Teresa Jackson, who appeared to be "upset" and who was "very animated" as she attempted to communicate with him. She had a bruise under her right eye and blood on her left hand. Allison perceived she was "hearing impaired."

¶ 43    The prosecutor asked Allison:

"Q. And how did you communicate with her?

A. I would write notes, and then she would either answer or she could use limited words or shake or nod her head and write down the answer.

Q. And did she cooperate with you in answering your questions?

A. Yes, she did.

Q. As to the questions that you asked her, there's just one thing that I want to clarify. You asked her the question, and correct me if I'm wrong, 'Did he cause the bruises to your face and injury to your hands?'

A. Yes, I did.

Q. And did she answer out loud, 'yes'?

A. Yes.

Q. So that wasn't written down. That was an out loud answer?

A. Yes."

¶ 44    After taking photographs of Jackson's injuries (People's exhibits Nos. 1 through 4), Allison located defendant at 2473 East North Street and arrested him. He placed defendant in the backseat of the squad car and headed for the police station.

¶ 45    The prosecutor asked Allison:

"Q. Now, after placing him in your car, did you attempt to advise him of his right to remain silent[?]

A. I did.

Q. And did he proceed to make some unsolicited statement?

A. Yes, he did.

Q. Did he appear to be intoxicated at this time?

A. Yes, he did.

Q. What gave you the impression that he was intoxicated?

A. His speech was a little hard to understand, and he smelled of the odor of an alcoholic beverage."

¶ 46    A video camera was mounted inside the squad car, and it was trained on defendant. People's exhibit No. 6 was the audio-video recording, with the periods of silence edited out (or, more precisely, shortened). The recording was played for the jury while the jury followed along in a transcript, People's exhibit No. 5.

¶ 47    People's exhibit No. 6 is a digital video disc (DVD). In the recording, defendant is seated in the backseat of the squad car, shirtless, with his hands handcuffed behind his back. His head lolls around, and sometimes he lays his head back on the seat. We quote People's exhibit No. 5, which appears to be an accurate transcription of the DVD:

"OFFICER BRIAN ALLISON: George, you understand you have the right to remain silent, right?

GEORGE APPELT: Shut the fuck up with that shit, man.

OFFICER: Excuse me? Excuse me? I didn't quite catch that.

OFFICER: Do you understand you have the right to remain silent?

GA: Bitch ass mother fuckers.

GA: So when did I supposedly beat her up?

GA: Fucking bitch ass mother-fuckers, man.

GA: She got her ass beat, she needed that anyway.

GA: That's right, look stupid[,] mother fucker, that's what you do best, right? Bitch ass nigger.

GA: –sighs–

GA: I shoulda went ahead and killed that mother fucking ho. Killed that mother fucker, man. Stinking mother fucking ho. Ride the fucking free life, ain't paid shit, [unintelligible] up in my house, that's alright, it's over, that bitch is done.

GA: Bitch ass mother fucker."

¶ 48    After the jury viewed this audio-video recording from the squad car, the prosecutor asked Allison:

"MS. KOLL: *** Now, Officer, did George ever in the time that you spent with him that morning report to you anything about a break-in at his house at 2473 East North Street?

A. No, he did not.

Q. Did he show you any damage to his house?

A. No.

Q. Did he express any concern over Teresa's well-being?

A. No.

Q. Did he say anything about being innocent and that somebody else had done this?

A. No.

Q. Are the only statements that he made to you the statements that were captured in

-10-

the video we just watched?

A. That's correct."

The prosecutor said she had no further questions.

¶ 49     Before beginning his cross-examination, the defense counsel told the trial court he had an objection that should be heard outside the jury's presence. The court excused the jury from the courtroom, and defense counsel moved for a mistrial on the ground that, by asking Allison if defendant had declared his innocence, the prosecutor had "improperly transfer[red] the burden upon the defense," implanting in the jury's mind an "improper belief that this defendant ha[d] to prove something."

¶ 50     After hearing further discussion from both sides, the trial court asked defense counsel, by way of summary:

"THE COURT: So your sole argument is the question, 'Did he say anything about being innocent or that someone else did it' is objectionable because it shifts the burden of proof?

MR. RUETER: That certainly, yes.

THE COURT: All right. I didn't quite understand that was the basis of your objection. I disagree. I would overrule that objection for obvious reasons which is in the context of spontaneous statements about an incident that just took place, one would expect that, had it not happened, that an innocent person would make those statements. You can argue otherwise to the jury, but–so with that, with that better understanding of Mr. Rueter's objection, it will be overruled."

¶ 51     The jury returned to the courtroom, and defense counsel asked Allison:

"Q. In part of your notes back and forth with Miss Jackson, you asked if–you wrote something to the effect of did–if he caused the injuries to her eye, hand, and back; correct?

A. Correct.

Q. And she didn't write an answer to that, but your testimony is that she answered 'yes'; is that right?

A. Correct.

Q. Did you ask–did you say at any time, 'Did George cause the injuries to your eye, hand, and back?'

A. I did not use the–I did not use 'George,' no. ***

Q. So you didn't take the time to make sure who that 'he' referred to?

A. I didn't believe I needed to.

Q. So you didn't do it?

A. Correct."

¶ 52     On redirect examination, the prosecutor asked Allison:

"Q. Why didn't you believe that you needed to say the word 'George' with each question you asked Teresa?

-11-

A. Well, George is the only person that was ever mentioned in the interview, and I just spent a few minutes specifically speaking about George–what's his name? What's his physical? And then I followed that up with 'Did he cause these injuries to you?' "

¶ 53 On re-cross-examination, defense counsel asked Allison:

"Q. Well, specifically what you asked was–after asking her her name and she giving a response to that and your asking her middle initial and date of birth, she gave you her middle name and her date of birth, you asked what his full name was, and she wrote 'George Appelt.' And then you asked, 'How long have you dated?' She wrote, 'Ten years.' You asked if they had any children. She said no. You asked what was his height, weight, hair, eye color, and so forth. So it was sometime after that that you asked this question at the very end of this written exchange, you asked about–in fact, you even wrote a thing about how you're going to give her information on how to get an order of protection too; is that correct?

A. Correct.

Q. And after all of that, at the very end, you go back to asking 'he.' If he caused the injuries?

A. Correct.

Q. But you didn't clarify who you meant by 'he'?

A. I never clarified 'he,' no.

Q. And she never clarified who she meant by 'he'?

A. No."

¶ 54 On redirect examination, the prosecutor asked Allison:

"Q. Did Teresa ever say anything to you, or was any other possible suspect ever discussed?

A. No.

Q. She never brought up another individual?

A. No.

Q. So the only male pronoun 'he' or 'his' that was ever discussed was George?

A. Correct."

¶ 55 D. Richard Lohse

¶ 56 The State rested, and the defense called Richard Lohse. He testified that in September 2011, he was building a house and that defendant was "helping [him] a little bit with it." According to Lohse, defendant helped him with the house the night before defendant's arrest.

¶ 57 Defense counsel asked Lohse:

"Q. All right. What did he do with you at the house and what happened?

A. I don't know. We was doing some carpenter work or whatever. We got done that night, and we had us a couple beers or whatever. He stayed with me. We wasn't going to drive or anything. We got up the next morning, and I went down, got him a 12 pack

for helping me, gave him a little bit of money. You know, it was probably somewhere around–I don't know–10:30, maybe 12 somewhere I took him back to his house.

Q. Now, did you go in when he went back to his house?

A. No. I just pulled up to the side of the house, and there is–it's like a two-story there, and there's steps going up it. I made sure he got in, and I left."

¶ 58    On cross-examination, Lohse testified that the house he was building was located at 3471 Doneta Avenue and that he and defendant stayed overnight at that address the night before defendant's arrest. The prosecutor asked Lohse:

"Q. Had the defendant been drinking at all before you dropped him off that morning?

A. Yeah. Well, he had a few beers that morning.

Q. Around what time had he started drinking that morning?

A. I don't know. He had had–he didn't drink the 12 pack. He had a few of them."

¶ 59    Lohse denied ever having a conversation with Jackson about this case.

¶ 60                                    II. ANALYSIS
¶ 61                          A. The Sufficiency of the Evidence
¶ 62                            1. *Our Standard of Review*
¶ 63    Citing *People v. Smith*, 185 Ill. 2d 532, 542 (1999), defendant argues we should reverse his conviction of aggravated battery if "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." But if that is what we are supposed to decide–whether the evidence is so unreasonable, improbable, or unsatisfactory as to justify reasonable doubt–what was the jury supposed to decide? It was the jury's job to decide whether the evidence was so unsatisfactory as to justify reasonable doubt or, conversely, whether the evidence was so satisfactory as to preclude reasonable doubt. On appeal, we do not retry the defendant. *People v. Robinson*, 213 Ill. App. 3d 1021, 1025 (1991). Instead, looking at the evidence in the light most favorable to the prosecution, we ask whether any rational trier of fact could find the essential elements of the crime to be proved beyond a reasonable doubt. *Smith*, 185 Ill. 2d at 541; *Robinson*, 213 Ill. App. 3d at 1025.

¶ 64    The crime in this case is aggravated battery as defined by section 12-3.05(d)(2) of the Criminal Code of 1961 (720 ILCS 5/12-3.05(d)(2) (West 2010) (added by Pub. Act 96-1551, art. 1, § 5 (eff. July 1, 2011))). That section provides: "A person commits aggravated battery when, in committing a battery, other than by discharge of a firearm, he or she knows the individual battered to be *** [a] person who is *** physically handicapped." On appeal, defendant does not dispute that an aggravated battery within the meaning of section 12-3.05(d)(2) occurred. Rather, he disputes only one element of this charged offense, namely, that he is the one who committed the aggravated battery. Therefore, looking at the evidence in the light most favorable to the prosecution, we ask whether any rational trier of fact could find, beyond a reasonable doubt, that defendant was the person who committed the aggravated battery (or aggravated batteries) of Jackson on September 10, 2011. See *Smith*, 185 Ill. 2d at 541.

## 2. *The Supposed Improbability That a Battered Woman Would Try To Protect the Perpetrator, Her Boyfriend*

¶ 65    "[A] conviction based upon testimony that is improbable, unconvincing, and contrary to human experience requires reversal." *People v. Vasquez*, 233 Ill. App. 3d 517, 527 (1992). Defendant argues that if he "had actually attacked Jackson as brutishly depicted in the prosecution's photographic exhibits," it would be improbable, unconvincing, and contrary to human experience that Jackson tried to protect him in the trial by refusing to identify him as the attacker: that she disingenuously claimed not to know who had beaten her even though she well knew it was he who had done so.

¶ 66    On the contrary, victims of domestic violence can be very forgiving. After their bruises heal and some time passes, they commonly change their mind about testifying against the loved one who beat them up. "It is estimated that up to eighty percent of domestic violence victims either recant or refuse to testify against their batterers." Kimberly D. Bailey, *It's Complicated: Privacy and Domestic Violence*, 49 Am. Crim. L. Rev. 1777, 1785 (2012). This problem is widely known.

¶ 67    ## 3. *The Supposed Unreliability of Communicating With Jackson Without a Sign Language Interpreter*

¶ 68    Defendant argues:

"In [the State's] desperat[e] reliance on [the testimony of Parker and Allison,] a crucial matter was omitted, which devalued the probative [effect] of this evidence: Jackson was severely hearing-impaired, which made communication with her unreliable, and hence untrustworthy.

Without a hearing aid, Jackson averred that in order for her to adequately communicate, she needed a sign language interpreter [citation to record] ***."

¶ 69    Actually, at the pages of the record that defendant cites, Jackson does not testify that she needs sign language interpreters in order to adequately communicate with people. Rather, she says "it's much easier for [her] to communicate through these interpreters." Using sign language is easier and faster than writing notes, just as talking is easier and faster than writing notes, but it does not follow that writing notes is an inadequate or unreliable method of communication. One would expect writing to be more careful and deliberative than sign language, just as it is more careful and deliberative than talking.

¶ 70    In her testimony, Jackson admitted she knew how to read and write simple English. Apparently, that was the only kind of English used in her written exchanges with Parker and Allison. Although she testified she had difficulty understanding "big words," she denied that Allison used any "big words" when communicating with her in writing.

¶ 71    Evidently, Jackson was the one who did all the writing when she went to see Parker. In the trial, Parker quoted Jackson's clear, simple written message from memory. We disagree with defendant that only a "trained professional interviewer" could have reliably communicated with Jackson.

-14-

¶ 72                          4. *The Antecedent of "He"*

¶ 73        Defendant argues that when Allison asked Jackson, " 'Did *he* cause the bruises to your face and injury to your hands?' " and Jackson answered yes, it is unclear that she understood Allison to mean defendant as opposed to some other, unspecified male. (Emphasis added.) But defendant was the only male previously mentioned in their written conversation. Interpreting the subsequent "he" as possibly meaning some male other than defendant would be unnatural. If a personal pronoun follows an antecedent–say, someone's proper name–and corresponds in gender to the antecedent, the personal pronoun is understood to refer to the antecedent unless the context demands some other understanding. One must reasonably infer that, by "he," Jackson understood Allison to mean the only male hitherto named, *i.e.*, George Alan Appelt, date of birth: November 2, 1964.

¶ 74        5. *The Probative Value of Defendant's Drunken Statements in the Squad Car*

¶ 75        According to defendant, the State "greatly exaggerated the probative value" of defendant's video-recorded statements in the squad car, considering that he was drunk when he made the statements and considering that he asked Allison, "So when did I supposedly beat her up?"

¶ 76        When we look at these statements in the light most favorable to the prosecution, we regard them as having high probative value, for three reasons. See *Smith*, 185 Ill. 2d at 541. First, defendant revealed his malice toward Jackson. He thought she deserved to be beaten for sponging off him. Arguably, if that is what he thought, he had, in his own mind, a reason to beat her. Second, the jury saw how angry and combative defendant could be when he was drunk. Third and most important, defendant implied that he did in fact beat Jackson. We refer to his remark "I shoulda went ahead and killed that mother fucking ho." If A accuses B of blackening C's eye and B responds, "I should have gone ahead and killed him," B strongly implies that he did indeed blacken C's eye. The phrase "should have gone ahead and killed him" signifies a violent procedure that B started and, to his regret, left unfinished.

¶ 77                          6. *The "Ironclad Alibi"*

¶ 78        According to defendant, Richard Lohse provided defendant with "an ironclad alibi." Lohse testified that, the day before defendant's arrest, defendant helped Lohse with a new house Lohse was building some 6.25 miles from defendant's apartment, that defendant and Lohse stayed overnight at this house, and that Lohse did not give defendant a ride home until approximately noon–two hours after the last attack on Jackson.

¶ 79        The short answer to this contention is that the jury did not have to believe Lohse, considering that, immediately after the attacks, Jackson twice identified defendant as her attacker. See *People v. Palmer*, 125 Ill. App. 3d 703, 711 (1984). "The jury is in a superior position to observe the witnesses and consider their interest in exonerating defendant." *Id.* Jackson testified that Lohse was defendant's friend. The jury could have reasonably inferred that Lohse was covering for him.

¶ 80        In sum, looking at all the evidence in the light most favorable to the prosecution, we

conclude that a rational jury could find, beyond a reasonable doubt, that defendant was the person who committed the aggravated battery of Teresa Jackson on September 10, 2011. See *Smith*, 185 Ill. 2d at 541.

¶ 81                    B. The Alleged Shifting of the Burden of Proof to the Defense

¶ 82                              1. *Our Standard of Review*

¶ 83     After playing for the jury the audio-video recording from inside the squad car, the prosecutor asked Allison a series of questions, including "Did [defendant] say anything about being innocent and that somebody else had done this?" "No," Allison answered. Then the prosecutor asked: "Are the only statements that he made to you the statements that were captured in the video we just watched?" "That's correct," Allison said.

¶ 84     Defense counsel moved for the declaration of a mistrial, arguing that the prosecution had "improperly transfer[red] the burden upon the defense" by asking Allison whether defendant had "sa[id] anything about being innocent and that somebody else had done this." The trial court asked defense counsel:

> "THE COURT: So your sole argument is the question, 'Did he say anything about being innocent or that someone else did it' is objectionable because it shifts the burden of proof?
>
> MR. REUTER: That certainly, yes.
>
> THE COURT: All right. I didn't quite understand that was the basis of your objection. I disagree."

The court overruled the objection.

¶ 85     By overruling the objection, the trial court necessarily denied the motion for a mistrial. We ask whether the denial of the motion for a mistrial was an abuse of discretion. See *People v. McDonald*, 322 Ill. App. 3d 244, 250 (2001). We apply the same deferential standard of review to the evidentiary ruling. See *People v. Gist*, 2013 IL App (2d) 111140, ¶ 11.

¶ 86     A decision is an abuse of discretion only if it is illogical, arbitrary, or contrary to law. *State Farm Fire & Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000). In other words, a decision is an abuse of discretion only if no reasonable person could agree with the decision. *Gist*, 2013 IL App (2d) 111140, ¶ 11.

¶ 87           2. *The Impossibility of Shifting the Burden of Proof by Asking What*

                  *Defendant Did Not Say in a Pretrial Statement to the Police*

¶ 88     Would all reasonable persons have to agree that the ground of defense counsel's objection was correct? Again, defense counsel objected that the prosecutor had shifted the burden of proof to the defense by asking Allison: "Did he say anything about being innocent and that somebody else had done this?" As defense counsel confirmed to the trial court, this supposed shifting of the burden of proof was the sole ground on which he was objecting. When an objection is made on a particular ground, all other, unexpressed grounds of objection are forfeited. *People v. Massie*, 137 Ill. App. 3d 723, 728 (1985).

¶ 89    So, when we scrutinize the prosecutor's question to Allison–"Did [defendant] say anything about being innocent and that somebody else had done this?"–the only issue before us is whether that question shifted the burden of proof to the defense. Defendant raises *other* issues in his brief, namely, whether the question violated due process by unfairly penalizing him for exercising his right to remain silent, a right that Allison had recited to him in the squad car (and which, actually, defendant declined to exercise) (see *Anderson v. Charles*, 447 U.S. 404, 408 (1980); *Doyle v. Ohio*, 426 U.S. 610, 618 (1976)), and whether defendant's not declaring his innocence to Allison was relevant (see *People v. Lewerenz*, 24 Ill. 2d 295, 299 (1962); *People v. Rothe*, 358 Ill. 52, 57 (1934)). But those issues, which are forfeited (see *Massie*, 137 Ill. App. 3d at 728), are different from the issue of whether the prosecutor shifted the burden of proof. A violation of *Doyle* or *Lewerenz* presupposes that the State used the defendant's pretrial silence as evidence in its own case, to help carry its own burden of proof, not that the State thereby shifted the burden of proof to the defense. See *United States v. Hampton*, 843 F. Supp. 2d 571, 578-79 (E.D. Pa. 2012).

¶ 90    A prosecutor shifts the burden of proof by suggesting to the jury that the defendant was obligated to *present evidence in the trial*. *People v. Giangrande*, 101 Ill. App. 3d 397, 401-02 (1981). For example, the prosecutor criticizes the defendant's failure to call witnesses at the trial who were equally available to the State and the defense. *People v. Wills*, 151 Ill. App. 3d 418, 421 (1986). But *cf. People v. Morando*, 169 Ill. App. 3d 716, 735 (1988) ("Although it is normally improper for the prosecution to comment on a defendant's failure to call a witness who is equally available to the prosecution [citations], such comment is not improper if the witness is an alibi witness or if the witness is not equally available [citation]."). Or the prosecutor criticizes the defendant's decision not to testify. *People v. Lyles*, 106 Ill. 2d 373, 390 (1985).

¶ 91    In the present case, the prosecutor did none of those things. She did not criticize defendant for failing to present evidence in the trial. Rather, she elicited evidence of what happened prior to the trial. She elicited evidence that as defendant spontaneously made remarks to Allison regarding the beating Jackson had received, defendant never added that he was innocent and that someone else had done the beating. Arguably, if defendant was handcuffed in the backseat of a squad car and was being transported to jail on the accusation that he had beaten Jackson, and if he was bold and crass enough to say she deserved to be beaten, one would expect that–if indeed the accusation against him were false–he would hasten to add, "*But* I wasn't the one who did it." See *United States v. Goldman*, 563 F.2d 501, 503 (1st Cir. 1977) ("A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits, and not on some artificial standard that only the part that helps him can be later referred to." (Internal quotation marks omitted.)). By eliciting evidence that defendant omitted that qualification from his statement in the squad car, the State did not shift the burden of proof to the defense but, rather, augmented the evidence in its own case. Therefore, we find no abuse of discretion in either the overruling of the objection or the denial of the motion for a mistrial.

¶ 92                            III. CONCLUSION

¶ 93        For the foregoing reasons, we affirm the trial court's judgment, and we award the State $50 in costs against defendant.

¶ 94        Affirmed.